In re Ana MELENDEZ, Debtor.

In re Linda S. SPENCER, Debtor.

In re Sheila LAFLEUR, Debtor.

In re Dana P. CALLAHAN, Debtor.

In re Robert J. BELISLE, Debtor.

In re Carla M. CROOKS, Debtor.

In re Vicki & Robert JOYCE, Debtors.

In re Donald & Nancy WAYLAND, Debtors.

Bankruptcy Nos. 97–45577–HJB, 97–44028–HJB, 97–45570–HJB, 97–45741–HJB, 97–43666–HJB, 97–45758–HJB, 97–45200–HJB and 97–47509–HJB.

United States Bankruptcy Court, D. Massachusetts.

Aug. 31, 1998.

Mark Polebaum, Boston, MA, for Sears.

Kathleen R. Downing, Newton Center, MA, for United States Trustee.

David L. Brunelle, Jr., South Hadley, MA, for Ana Melendez and Sheila Lafleur.

Cecilia P. Calabrese, for Linda S. Spencer.

Kathleen Patenaude, Billerica, MA, for Dana P. Callahan.

Thomas N. Wilson, Holyoke, MA, for Robert J. Belisle and Carla M. Crooks.

Lisa Van Gordon D'Errico, for Vicki Joyce.

Stephen A. Lechter, Attleboro, MA, for Donald J. Wayland.

## MEMORANDUM OF DECISION

HENRY J. BOROFF, Bankruptcy Judge.

Before the Court for Determination is a Motion for Recusal (the "Recusal Motion") filed by Sears, Roebuck and Company ("Sears"). The movant requests this Court's recusal from ongoing hearings regarding reaffirmation agreements between each of the above-captioned debtors and Sears. Those hearings have been conducted pursuant to this Court's orders to show cause why counsel for each such debtor did not violate Federal Rule of Bankruptcy Procedure 9011 ("Rule 9011") by signing the "declaration of attorney" which accompanied the respective reaffirmation. Among other arguments, Sears contends that this Court is utilizing these Rule 9011 inquiries to advance the improper "agenda" of prohibiting Sears from

soliciting reaffirmation agreements in circumstances that, according to Sears, this Court "personally finds reprehensible." Sears argues that this Court must recuse itself from these proceedings pursuant to 28 U.S.C. § 455(a), which provides that "[a]ny justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned."

Undoubtedly, a request for recusal is a serious matter and must be so treated by any Court whose motives are questioned. Therefore, the Court will describe the statutory foundation for its inquiries, the development of applicable case law within this District, Sears' practices as they pertain to those inquiries, the relevant fact patterns of the cases before this Court, the progress of the instant proceedings, and finally, whether this Court's actions mandate recusal.

## I. *THE STATUTORY PREDICATE*

The commencement of a voluntary case under Chapter 7, 11 or 13 "constitutes an order for relief under such chapter." *See* 11 U.S.C. § 301. The filing of the petition triggers various rights and obligations, some immediately and some contingently, depending on the progress of the case. Among the rights afforded to the individual debtor is a discharge of various types of prepetition indebtedness unless discharge is precluded under 11 U.S.C. §§ 523 or 727. In legislating that right to discharge, Congress intended to afford the "honest but unfortunate" debtor a "fresh start." *Grogan v. Garner*, 498 U.S. 279, 286–87, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991) (one of Bankruptcy Code's primary goals is to afford a "fresh start" to an "honest but unfortunate debtor").

The history of bankruptcy law is indeed one of perennial struggle between debtors and creditors seeking to improve their respective rights. The development of § 524 of the Bankruptcy Code (11 U.S.C. § 524) is only one of several battlegrounds between the two. That section now permits an individual debtor, under limited conditions, to "reaffirm" otherwise dischargeable debt by entering into a form of novation with the affected creditor. However, to the extent that such reaffirmations threaten a debtor's "fresh start," a primary goal of Congress is affected. And the evolution of § 524, notwithstanding its permutations, reveals a continuing concern by Congress that reaffirmations not be permitted to undermine that "fresh start."

### A. History and Present Construction of § 524(c) and (d)

The Bankruptcy Act of 1898 did not address the reaffirmation of dischargeable debts. However, it was generally understood that a debtor "could waive the discharge protection and make a new promise to repay the debt. Such a promise was generally held enforceable despite a lack of new consideration." *Mandrell v. Ford Motor Credit Co. (In re Mandrell)*, 50 B.R. 593, 595 (Bankr.M.D.Tenn.1985).

In 1970, the Commission on the Bankruptcy Laws of the United States (the "Commission") was created to study bankruptcy reform. After conducting many public hearings and performing extensive research, the Commission submitted a report of its recommendations to Congress in July of 1973. The Commission identified the lack of regulation of reaffirmations as a flaw in the Bankruptcy Act, stating:

> Substantial evidence of the use of reaffirmations to nullify discharges has come to the Commission's attention. To the extent reaffirmations are enforceable, the "fresh start" goal of the discharge provisions is frustrated. Reaffirmations are often obtained by improper methods or result from the desire of the discharged debtor to obtain additional credit or continue to own property securing a discharged debt.

Report of the Commission on the Bankruptcy Laws of the United States, H.R. Doc. No. 93–137, 93d Cong., 1st Sess. (1973) (part I, chapter 7, section C.3). The Commission "recommended that the reaffirmation of a secured debt be enforceable but only to the extent of the fair market value of the property at the date of the petition," and that reaffirmation of any other debts not be permitted. *Id.*

From 1973 to 1978, bankruptcy reform was the subject of much Congressional debate. The House of Representatives took the lead, and eventually approved a bill, H.R. 8200,[1] which strictly limited the reaffirmation of dischargeable debt. The pertinent section provided:

> (b) After the commencement of a case under this title, a creditor may not enter into an agreement with the debtor the consideration for which in whole or in part is based on a debt of the debtor that is dischargeable in a case under this title, whether or not discharge of such debt is waived. Any such agreement is void.

> (c) Notwithstanding subsection (b) of this section and sections 727, 1141, and 1328 of this title, an agreement of the kind specified in subsection (b) of this section that is entered into in good faith and that is approved by the court is enforceable only if such agreement is—

> (1) in settlement of litigation under section 523 of this title; or

> (2) an agreement providing for redemption under section 722 of this title.

H.R. 8200, 95th Cong., § 524(b) & (c) (1978).[2]

On the other side of the Capitol Building, a subcommittee of the Senate Judiciary Committee approved a bill, S. 2266, which was similar to the House version. However, after S. 2266 was reported to the entire Senate, an amendment which permitted the reaffirmation of dischargeable debts was proposed and approved. The pertinent section read:

> A debt extinguished by discharge in a case under this title may be revived or reaffirmed by written instrument or be all or part of any bargain creating a new debt except, however, the debtor may rescind his revival or reaffirmation by written notice to all concerned creditors within 30 days of such revival or reaffirmation. Any judgment, whenever obtained, that a debtor is personally liable to pay a debt extinguished by discharge, and not revived or reaffirmed in accordance with this section, is null and void.

124 Cong. Rec. S14,722 (daily ed. Sept. 7, 1978) (to be codified at § 524(b)).[3]    As

---

1. H.R. 8200 was a fusion of many bankruptcy reform suggestions, culled from legislative proposals of the Commission and the National Conference of Bankruptcy Judges, House hearings, meetings of the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, and statements from members of the bench, bar, and academia. For a comprehensive history of the events leading up to the passage of the Bankruptcy Code of 1978, see Kenneth N. Klee, *Legislative History of the New Bankruptcy Law*, 28 DePaul L.Rev. 941 (1979), reprinted in *Collier on Bankruptcy* app. B (15th ed. rev. 1996).

2. The report of the Judiciary Committee written to accompany H.R. 8200 noted that "about 1/3 of all discharged debts to finance companies are reaffirmed." H.R.Rep. No. 95–595, 95th Cong., 1st Sess., at 163. The Committee's report criticized lenders for employing the following questionable tactics (among others) to persuade debtors to reaffirm debts. First, threatening debtors that they would "damage the debtor's personal or credit reputation [with] letters to an employer, phone calls to friends, and so on." *Id.* Second, offering debtors new credit. The extension of further credit permitted "the finance company to reduce its bankruptcy losses ... [and] to evade the usury [sic] laws. Interest on consumer loans is precomputed and discounted, and a reaffirmation added to a new loan allows the lender to charge interest on interest." · *Id.* Third, where the lender held a security interest in the debtor's

household and personal goods, representing that such items would be repossessed unless the debtor reaffirmed the underlying debt. "A threat of repossession is a very effective tool in getting the debtor to reaffirm for the full amount of the debt due, even though the market value of the goods involved is far below the amount of the debt. The debtor reaffirms because the replacement cost of the goods is high." *Id.*

3. It is interesting to compare the two camps' statements regarding how reaffirmation of dischargeable debt plays into consumer bankruptcies. Senator Dewey Bartlett, the proponent of the amendment in the Senate, made the following statements on the Senate floor:

    > Although I believe the Judiciary Committee's effort was well intended, the effect of its amendment is to deprive consumers of a right they have always had, that is, of renewing a debt discharged in bankruptcy.

    > Without this right consumers will be denied the opportunity to protect a cosigner such as [a] wife, relative, or other family member from liability; or to protect collateral such as an automobile from repossession; or to honor a moral obligation. Even more importantly, the ban on reaffirmation in the committee bill can jeopardize a consumer's ability to save his home from foreclosure.

    > . . . .

    > As a practical matter, thousands upon thousands of bankrupts reaffirm or revive debts

amended, S. 2266 was passed by the Senate.

The leaders of the relevant committees of each house of Congress then conferred over the different versions of their proposed legislation and arrived at a compromise. That compromise included an amended § 524. Under the proposed change, reaffirmation of any discharged debt would be permitted, but subject to restriction. The agreement would have to be reached before discharge entered, and the debtor would be afforded 30 days from when the agreement became enforceable in which to rescind it. If the reaffirmation involved "a consumer debt . . . not secured by real property of the debtor," court approval was required. And in order for such approval to be granted, the court had to find either (1) that reafffirmation did not impose an undue hardship on the debtor and was in the debtor's best interests, or (2) if the agreement reflected either redemption of the collateral or the settlement of a § 523 dischargeability dispute, that it was entered into in good faith. Finally, the court was required to hold a discharge hearing for every individual debtor. At the hearing, the court was to inform each debtor (1) that he or she was not required (by the Code or otherwise) to reaffirm any dischargeable debts, if the debtor was planning on or had agreed to do so, and (2) as to the legal effect and consequences of the reaffirmation and a default thereunder.[4]

The revised bill was passed by both houses of Congress and signed into law by President

---

with creditors each year for amounts totaling many millions of dollars. They do so voluntarily because they know it is to their advantage. I believe consumers should be able to retain that right. I also believe creditors should be able to recoup some of their losses. What is wrong with reaffirmation if it is voluntary?

124 Cong. Rec. S14,722 (daily ed. Sept. 7, 1978) (statement of Sen. Bartlett). On the other side, the House Judicial Committee report accompanying H.R. 8200:

The consumer finance industry strongly opposes [§ 524 as proposed by the House committee]. It has argued that debtors frequently voluntarily repay debts, and that debtors should not be prohibited from repaying discharged debts, out of a sense of moral obligation or for other reasons. "Voluntary", however, is somewhat euphemistic, and often has led to court action to enforce "voluntary" repayments. The bill recognizes the truly voluntary situation and permits legitimately voluntary repayments, but denies creditors court process to enforce a reaffirmation, other than under a nondischargeability or redemption agreement.

H.R.Rep. No. 95–595, 95th Cong., 1st Sess., at 164 (footnotes omitted).

4. Section 524 provided, in relevant parts:

(c) An agreement between a holder of a claim and the debtor, the consideration for which, in whole or in part, is based on a debt that is dischargeable in a case under this title is enforceable only to any extent enforceable under applicable nonbankruptcy law, whether or not discharge of such debt is waived, only if—

(1) such agreement was made before the granting of the discharge . . . ;

(2) the debtor has not rescinded such agreement within 30 days after such agreement becomes enforceable;

(3) the provisions of subsection (d) of this section have been complied with; and

(4) in a case concerning an individual, to the extent that such debt is a consumer debt that is not secured by real property of the debtor, the court approves such agreement as—

(A) (i) not imposing an undue hardship on the debtor or a dependent of the debtor; and

(ii) in the best interest of the debtor; or

(B) (i) entered into in good faith; and

(ii) in settlement of litigation under section 523 of this title, or providing for redemption under section 722 of this title.

(d) In a case concerning an individual, when the court has determined whether to grant or not to grant a discharge . . . the court shall hold a hearing at which the debtor shall appear in person. At such hearing, the court shall inform the debtor that a discharge has been granted or the reason why a discharge has not been granted. If a discharge has been granted and if the debtor desires to make an agreement of the kind specified in subsection (c) of this section, then at such hearing the court shall—

(1) inform the debtor—

(A) that such an agreement is not required under this title, under nonbankruptcy law, or under any agreement not made in accordance with the provisions of subsection (c) of this section; and

(B) of the legal effect and consequences of—

(i) an agreement of the kind specified in subsection (c) of this section; and

(ii) a default under such agreement;

(2) determine whether the agreement that the debtor desires to make complies with the requirements of subsection (c)(4) of this subsection, if the consideration for such agreement is based in whole or in part on a consumer debt that is not secured by real property of the debtor.

Carter.[5] Thus, while the Commission's recommendation that the reaffirmation of dischargeable debt be prohibited did not survive the journey through Congress, substantial debtor protections regarding reaffirmations were incorporated into the Code.

The reaffirmation provisions in sections 524(c) and (d) have been substantively amended twice since 1978. The Bankruptcy. Amendment and Federal Judgeship Act of 1984 (the "1984 Amendment") made several changes. First, the requirement that all reaffirmations of consumer debt not secured by real property be approved by the court was replaced with a provision *requiring* court approval of such reaffirmations *only* where the debtor was pro se.

Second, where a debtor is represented by counsel in negotiating the reaffirmation, § 524, as amended, requires counsel for the debtor to sign an affidavit attesting that the agreement "represents a fully informed and voluntary agreement by the debtor" and "does not impose an undue hardship on the debtor or a dependent of the debtor." Third, and finally, the subsection allowing a debtor 30 days to rescind a reaffirmation was replaced with a provision entitling the debtor to rescind the agreement "at any time prior to discharge or within sixty days after such agreement is filed with the court, whichever occurs later." [6]

The Bankruptcy Reform Act of 1994 (the "1994 Amendment") made some technical changes and added two new requirements to § 524(c). Subsection (c)(2)(B) now provides that any reaffirmation filed with the court must "contain[ ] a clear and conspicuous statement which advises the debtor that such agreement is not required under this title, under nonbankruptcy law, or under any agreement not in accordance with the provisions of this subsection." Subsection (c)(3)(C) now requires that the affidavit of an attorney who has represented a debtor in negotiating a reaffirmation explicitly state that "the attorney fully advised the debtor of the legal effect and consequences of" a reaffirmation and any default under such an agreement. Also, § 524(d) was amended to reflect that bankruptcy courts are *required* to hold a hearing on a reaffirmation *only* where the debtor was not represented by an attorney in the negotiation thereof.

Thus, the present version of § 524(c) and (d) differs from the 1978 version as follows. First, debtors can now rescind a reaffirmation up to 60 days after entering into the agreement or until discharge enters, whichever occurs later, as opposed to "30 days after such agreement becomes enforceable." Second, bankruptcy courts are no longer required to approve all reaffirmations of debts not secured by real property, only those where the debtor is not represented by counsel in negotiating the agreement. Third, where the debtor was represented by counsel in the negotiation of the agreement, the attorney must now file a declaration stating that the agreement "represents a fully informed and voluntary agreement by the debtor," that the obligation does not impose an undue hardship on the debtor or a dependent, and that the attorney fully advised the debtor of the legal effect and consequences of the agreement to reaffirm the debt, and any default by the debtor. Fourth, the agreement now must contain clear and conspicuous statements advising the debtor of the rescission period, and that the debtor is not required to reaffirm the debt. Fifth, and finally, the current statute explicitly states that reaffirmations must be filed with the court, although that was certainly also required under the previous version of the statute.

## B. Bankruptcy Rule 9011

■ Federal Rule of Bankruptcy Procedure 9011 was adapted from Federal Rule of

---

**5.** The bill was amended by the Senate once more before passage, and those amendments were eventually accepted by the House. However, these changes did not affect § 524.

**6.** The 1984 Amendment also created a subsection (f) to § 524, which provides: "Nothing contained in subsection (c) or (d) of this section prevents a debtor from voluntarily repaying any debt."

Further, the new act added § 521(2), requiring that debtors file a statement of intention "with respect to the retention or surrender of" any property secured by consumer debts, and that the intention be performed within forty-five days after the filing of the statement unless the court allows additional time.

Civil Procedure 11 ("FRCP 11"), and the substantive provisions of the two are virtually identical. Their purpose "is to control the practice of attorneys, or those who act as their own attorneys, in the conduct of litigation in the federal courts." *Business Guides, Inc. v. Chromatic Communications Enter., Inc.,* 498 U.S. 533, 554, 111 S.Ct. 922, 935, 112 L.Ed.2d 1140 (1991) (Kennedy, J., dissenting). To that end, subdivision (b) of Rule 9011 provides:

> (b) Representations to the court. By presenting to the court (whether by signing, filing, submitting, or later advocating) a petition, pleading, written motion, or other paper, an attorney or unrepresented party is certifying that to the best of the person's knowledge, information, and belief, *formed after an inquiry reasonable under the circumstances,—*
>
> > (1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation;
> >
> > (2) the claims, defense, and other legal contentions therein are warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law;
> >
> > (3) *the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely to have evidentiary support after a reasonable opportunity for further investigation or discovery;* and
> >
> > (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on a lack of information or belief.

Fed. R. Bankr.P. 9011(b)(emphasis supplied).

■ Bankruptcy courts are empowered to levy an appropriate sanction upon a party who violates Rule 9011(b), and a court may initiate a Rule 9011 sanctions inquiry *sua sponte.* Fed. R. Bankr.P. 9011(c)(1)(B). The court must issue an order describing the suspect conduct and directing the responsible party to show cause why it has not violated the rule. *Id.*[7] The sanction "shall be limited to what is sufficient to deter repetition of such conduct or comparable conduct by others similarly situated." Fed. R. Bankr.P. 9011(c)(2). Further, the sanction may consist of or include "directives of a nonmonetary nature, an order to pay a penalty into court, or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of some or all of the reasonable attorneys' fees and other expenses incurred as a direct result of the violation." *Id.* Rule 9011 sanctions, like FRCP 11 sanctions, "are entirely discretionary and may include ... the striking of the offensive pleadings." *Nault's Auto. Sales, Inc. v. American Honda Motor Co., Inc., Acura Auto. Div.,* 148 F.R.D. 25, 37 (D.N.H. 1993).

## C. The Interplay of § 524 and Rule 9011

■ Rule 9011 clearly applies to § 524(c)(3) attorney declarations. *See* Fed. R. Bankr.P. 9011(b) (documents covered by rule include "a petition, pleading, written motion, or other paper"); *see also In re Hovestadt,* 193 B.R. 382, 385–86 (Bankr.D.Mass. 1996); *see also In re Lindley,* 216 B.R. 811 (Bankr.N.D.Ill.1998); *In re Bruzzese,* 214 B.R. 444 (Bankr.E.D.N.Y.1997). Thus, in executing the § 524(c)(3) declaration, counsel to a debtor represents and attests to the court that he or she has conducted "an inquiry reasonable under the circumstances" into whether the obligation imposed by the reaffirmation would impose an undue hardship on the debtor or the debtor's dependents. § 524(c)(3)(B); Fed. R. Bankr.P. 9011(b). Counsel also certifies that there is evidence to support his or her contentions that the agreement "represents a fully informed and voluntary agreement by the debtor," and that he or she fully advised the debtor of the

---

7. In three of the cases before the Court, *Melendez, Crooks,* and *Belisle,* the Court conducted the instant hearings without having issued a show cause order. However, the purpose behind Rule 9011(c)(1)(B), that being to ensure that a party is given an opportunity to respond and state its case before any sanction is levied, has been met. Extensive hearings have been held in these matters, at which all the parties (including the debtors themselves) have been heard from, and no sanctions have yet been levied. Therefore, this Court does not believe that this technical omission should preclude further proceedings in those cases.

legal effect and consequences of the agreement and a default under the agreement. § 524(c)(3)(A), (C); Fed. R. Bankr.P. 9011(b)(3), (4).[8]

The § 524(c)(3) declaration is not offered by the debtor's counsel in a vacuum. In Schedules I and J, the debtor represents, under oath, the amount of his or her monthly income and monthly expenses. Sometimes, a bankruptcy discharge represents a complete solution to a debtor's financial problems. Sometimes, the elimination of dischargeable debt helps, but the debtor's postpetition cash flow remains negative. Therefore, where a comparison of Schedules I and J reflects that, even with the benefit of a bankruptcy discharge, the debtor's postpetition income will be exceeded by postpetition expenses, a § 524(c)(3) attorney declaration representing that an undue hardship will not result from the reaffirmation of unsecured, otherwise dischargeable, debt presents a certain "dissonance." The same "dissonance" is manifested when postpetition cash flow is negative and the debtor reaffirms to retain consumer goods whose total value is less than the amount sought to be reaffirmed, and/or where replevin of the goods is unlikely.[9] The Rule 9011 question presented is what reasonable inquiry debtor's counsel made in those circumstances before executing the § 524(c)(3) declaration. *Cf. Bruzzese,* 214 B.R. at 450 ("[A] sampling of the debtors' schedules I and J in the 30 cases [examined] raised a prima facie concern whether the debtors could meet their repayment obligations under these [reaffirmation] agreements.").

■ Of course, there could be a satisfactory explanation. For instance, the debtor's income could have risen between the date the schedules were completed and when the debt was reaffirmed. The point is that the explanation is critical, and because, where postpetition expenses exceed postpetition income, it appears, without further explanation, that the § 524(c)(3) attorney declaration is without foundation, further inquiry by the court (e.g., by the issuance of an order to show cause) is warranted. *See* Fed. R. Bankr.P. 9011(c)(1)(B) (where party's or attorney's conduct *"appears* to violate subdivision (b)," court may enter a show cause order on its own initiative) (emphasis added); *see also Bruzzese,* 214 B.R. at 450–51; *Hovestadt,* 193 B.R. at 386.

Sears has contended in the past that bankruptcy courts are without authority under § 524 to annul a reaffirmation agreement accompanied by an attorney's declaration. *See Bruzzese,* 214 B.R. at 450 (noting this argument by Sears). Indeed, some courts have held that they lack authority to review a reaffirmation which was negotiated by an attorney on a debtor's behalf and otherwise meets the requirements of § 524. *See In re Bauer,* 1997 WL 752652, at *5 (Bankr. E.D.Va. Nov. 12, 1997) ("Because court approval is not required for any reaffirmation agreement when the debtor is represented by an attorney, the court concludes that it would be unwise and inappropriate to impose its own judgment—where Congress has expressly chosen not to provide for such review—on a reaffirmation agreement that the debtor has freely entered into on the advice of counsel."); *In re Grinnell,* 170 B.R. 495, 495–96 (Bankr.D.R.I.1994). This Court respectfully disagrees.

The plain language of the statute and the legislative history of the 1984 Amendments establish that the approach taken by the courts in *In re Hovestadt* and *In re Bruzzese* is the correct one. As Judge Bernstein noted in *Bruzzese,* "there is no language pre-

---

8. Rule 9011(b) does allow attorneys to make (Fed. R. Bankr.P. 9011(b)(3)) or deny (Fed. R. Bankr.P. 9011(b)(4)) factual contentions without full-fledged evidentiary support, but only where the factual contention made is "likely to have evidentiary support after a reasonable opportunity for further investigation or discovery," or the denial of a contention is "reasonably based on a lack of information or belief." Such qualified statements or denials must be specifically identified in the document. Fed. R. Bankr.P. 9011(b)(3), (4). Nevertheless, these provisions cannot be employed in a § 524(c)(3) declaration of attorney, because the statute requires attorneys to make the three statements set forth in § 524(c)(3)(A) through (C) definitively.

9. Where the property sought to be retained is of substantially greater value (e.g., a residence or an automobile) and the likelihood of loss by foreclosure or replevin is greater, the dissonance is correspondingly smaller.

cluding a bankruptcy court from scheduling a hearing if a reaffirmation is filed with a declaration." *Bruzzese*, 214 B.R. at 450. Congress did not *prohibit* bankruptcy courts from holding hearings on such reaffirmations, or condition the circumstances under which hearings could be held.[10] Although Congress removed the mandatory discharge hearing requirement when it rewrote the statute in 1984, it also added language which mandates that all reaffirmations be filed with the bankruptcy court. *See* § 524(c)(3); *In re Latanowich*, 207 B.R. 326, 335 (Bankr. D.Mass.1997). If Sears were correct and bankruptcy courts lacked authority to annul attorney-negotiated reaffirmations, why would it be necessary for such agreements to be filed with the courts?

The legislative history of the 1984 Amendments further elucidates the intent of Congress. The Senate report accompanying the bill which proposed the amendment to § 524 (eventually incorporated into the 1984 Amendments) provided:

> Whereas the 1978 act required, as to reaffirmations of consumer debts, prior court approval for the agreement to be effective, the new section provides for immediate effectiveness of the agreement upon its filing with the court, *subject to the court's review of the agreement pursuant to the exercise of its equitable jurisdiction . . . .* The purposes of the new section are (1) to lower the cost to the parties of the reaffirmation transaction; (2) to minimize the potential burden on the bankruptcy court, and (3) *to ensure that the court is properly informed of such agreements so that it may exercise equitable powers to protect the debtor from overreaching creditors.* While the purpose of the new section is to abolish the cumbersome "Miranda Warning" approach of the 1978 act, it is nevertheless intended that the court review will constitute more than a rubber stamp of the agreement. The key consideration should be ensuring that the debtor will not suffer an undue hardship by the execution of any reaffirmation agreements. In short, the

debtor's fresh start should not be impaired by any such agreements.

S.Rep. No. 98–65, pt. Ill.A.9, 59 (1983) (emphasis added). Therefore, the amended § 524 was not intended to eliminate bankruptcy court authority to review reaffirmations accompanied by a § 524(c)(3) attorney declaration. *See In re Lindley*, 216 B.R. at 818 ("Congress never removed the court's power to approve or disapprove a reaffirmation agreement after it is filed, and amendments to § 524 certainly did not expressly do so."); *Turner*, 208 B.R. at 436–37 (same); *In re Oliver*, 99 B.R. 73, 76 (Bankr.W.D.Okla. 1989) (same).

■ Accordingly, this Court agrees with Judge Feeney's conclusion in *Hovestadt* that bankruptcy courts continue to have "an independent obligation to review reaffirmation agreements," even where they are accompanied by a § 524(c)(3) attorney declaration. *Hovestadt*, 193 B.R. at 386. And if the court finds upon its review that the reaffirmed obligation will impose an undue hardship on the debtor (or that the debtor was not fully informed, entered into the agreement involuntarily, or had not been properly advised about the consequences of the agreement), it must then finally consider what sanction, if any, is appropriate. Judge Feeney faced this issue in *Hovestadt*, as did Judge Bernstein in the more recent *Bruzzese* case. Both concluded that the attorney declaration must be struck and the reaffirmation deemed unenforceable "because the prerequisite of section 524(c)(3) is lacking." *See Hovestadt*, 193 B.R. at 386–87; *Bruzzese*, 214 B.R. at 451; *see also In re Turner*, 208 B.R. 434, 437 (Bankr.C.D.Ill.1997); *In re Izzo*, 197 B.R. 11, 12 n. 2 (Bankr.D.R.I.1996).

## II. SECTION 524(C)(3) AND RULE 9011 IN THE CONTEXT OF CURRENT INQUIRIES

In order to properly evaluate any attorney's representation under Rule 9011, it is patently unfair to view the actions of the signer out of context. Any pleading signed

---

**10.** Where Congress wanted to prohibit bankruptcy court involvement, it was not hesitant in doing so explicitly. *See, e.g.,* 11 U.S.C. § 341(c) ("The court may not preside at, and may not attend, any meeting under this section including any final meeting of creditors."); 28 U.S.C. § 157(b)(5) (bankruptcy court may not hear personal injury or wrongful death actions).

by an attorney must be viewed in light of the facts at his or her disposal, including, without limitation, the information supplied by the client, the information supplied by the opposing party, and the relevant statutory and case law. Here, the challenged representation is that the respective debtors have been fully informed as to the legal consequences of their reaffirmation agreements, and that the reaffirmation of the referenced consumer debt will not constitute an undue hardship for them or for their dependents.

■■■■ The Bankruptcy Code does not define the term "undue hardship." However, this Court would deem reaffirmation to cause a debtor "undue hardship" where it would result in a significant, but otherwise avoidable, obstacle to the attainment or retention of necessaries by the debtor or the debtor's dependents. It seems logical that counsel for a debtor, called upon to make the determination that the reaffirmation of debt will not cause an undue hardship to the debtor or the debtor's dependents, would be fully apprised of various facts—including the amount and terms of the debt to be reaffirmed, whether the goods to be retained are necessaries of the debtor or the debtor's dependents, whether there is a real risk of replevin if the debtor opts not to reaffirm, and what would be revealed by a comparison of the replacement value of the subject goods with the amount of reaffirmed debt. Therefore, in order to properly evaluate the Rule 9011 issues, the Court must determine in each case what facts were at the disposal of the debtor's counsel, what information was supplied by the debtor, what information was supplied by the creditor, and whether the attorney's inquiry was reasonable under the circumstances.

Sears argues that this inquiry is not, at bottom, this Court's goal. Rather, Sears contends that this Court bears a personal bias toward Sears as demonstrated by the cases selected by this Court for review, and this Court's comments to Sears' counsel. That is not correct. Sears' practices have been the subject of inquiry solely on account of the frequency of Sears' reaffirmation

agreements in this district and the unmistakable impact of those practices on the daily decisions which attorneys make in fulfilling their responsibilities under Rule 9011 when signing the § 524(c)(3) declarations in reaffirmation agreements. To further elucidate, the Court will describe the policies adopted by Sears in this district, how case law in this district has developed as a result, modifications made by Sears in response to those decisions, who these debtors are, why this inquiry is necessary and what it has revealed to date.

## A. Sears Reaffirmation Practices From 1984 through 1997 [11]

Sears is a national retailer of consumer goods. Thus, as is true for all retailers, Sears has been particularly impacted by the growth of consumer bankruptcy filings in this district and throughout the United States. Because Sears offers credit to its customers directly or through an affiliate, Sears frequently holds a claim when one of its customers files a bankruptcy petition. When applying for credit, the Sears customer agrees that goods purchased but unpaid will be subject to a security interest held by Sears. The retention of that security interest is noted on the cash register receipt given to the customer at the point of sale.

Each debtor filing for Chapter 7 protection is required to attend a public meeting with the bankruptcy trustee and creditors, *see* 11 U.S.C. § 341. Commencing in or about 1987, Sears determined to send representatives to each such meeting that involved its customers who had outstanding balances. Their goal was to solicit reaffirmation agreements. *See* Mar. 2, 1998 Hrg. Tr. at 65. First, Sears would send a letter to the debtor or to the debtor's counsel, listing the claimed collateral, describing the Sears security interest, setting forth Sears' valuation of the collateral, advising the debtor that (according to Sears) his or her options were limited to surrender, redemption or reaffirmation, and then offering reaffirmation, with or without revival of a Sears line of credit. *See* Tr. of Mar. 13, 1998 at 46, 57. The offer of reaf-

---

11. This Court's description of Sears' reaffirmation practices is primarily drawn from testimony of Sears employees during the subject hearings in the instant matter.

firmed terms would not describe the interest rate, the cost of the credit or the period of amortization. The Sears representative would then meet with the debtor or the debtor's counsel, if represented, at the § 341 meeting and again offer the reaffirmation agreement. Because § 341 facilities are public, those reaffirmation conversations often took place in open areas with large numbers of other debtors and attorneys milling about.

The Sears representatives were not attorneys, nor were they given extensive credit training or information about the debtor; rather, they were provided only with form reaffirmation agreements, a description of the collateral and a stated value for the collateral, as determined by Sears. They were instructed to offer reaffirmation of the Sears debt, and, based solely on the debtor's willingness to reaffirm, to offer a revival of the debtor's Sears credit line in whole or in part or even an increase in credit. Notably, Sears representatives were not instructed to determine whether the debtors had the financial wherewithal to repay to Sears either the original debt to be reaffirmed or the increased debt. In fact, the representatives understood that the debtor's ability to repay was not a subject for their concern. Furthermore, with limited exception, it was Sears' policy to draw no distinction as to the type of collateral under discussion or its value to Sears on repossession. In pursuit of those agreements, infant cribs and other furniture, children's toys, medical devices including eyeglasses and hearing aids, and used automobile tires and batteries were included with stoves, refrigerators, televisions, and other appliances as the subject matter of reaffirmation agreements.[12]

The year 1995 brought the first Massachusetts published judicial reaction. *In re Iappini,* 192 B.R. 8 (Bankr.D.Mass.1995), focused on language contained in the Sears

form reaffirmation agreement. The language of the agreement, listing the possible reasons for which the debtor had agreed to reaffirm the debt, included a desire by the debtor "to settle creditor's claims of nondischargeability under [§ ] 523." *Id.* at 9. Judge Hillman took issue with the presence of that provision because, in the overwhelming majority of instances, Sears had not commenced a nondischargeability proceeding against the debtor. He found that the clause was "designed to entice the Debtors to reaffirm an obligation and ... [was] without good cause and hence ... made in bad faith." *Id.* at 10. He further ruled prospectively that any reaffirmations containing the identified language in a case where a nondischargeability adversary proceeding had not been filed would "be considered a violation of Fed. R. Bankr.P. 9011 and/or a contempt of this Court and appropriate sanctions [would] be considered upon notice and an opportunity to be heard." *Id.*

Next came *In re Hovestadt,* 193 B.R. 382 (Bankr.D.Mass.1996). Ms. Hovestadt sought to reaffirm a debt to Sears in the amount of $1,137.39, payable in monthly installments of $28. *Id.* at 383–84. In the joint debtors' Schedules I and J, the debtor and her husband reported a monthly deficit of $1,137, and that their income was derived exclusively from "pension or retirement income." *Id.* at 383. A declaration of attorney attesting that the reaffirmation would not constitute an undue hardship for Ms. Hovestadt had been filed with the agreement.

After reviewing the reaffirmation agreement and the debtors' schedules, Judge Feeney ordered Ms. Hovestadt, her attorney, and Sears to appear at a hearing and "to show cause why sanctions should not be imposed for the filing of false schedules by Mrs. Hovestadt, the filing of a false declaration by

---

12. During the course of the instant evidentiary hearings, this Court inquired of each of the Sears representatives involved in these cases as to whether he or she had ever threatened a debtor with repossession of consumer goods if the debtor refused to surrender the goods or execute an acceptable reaffirmation agreement. Each of the said representatives testified, under oath, that, during the course of his or her career with Sears (in some cases spanning over ten years) he or she

never threatened repossession of the goods. Even were the Court to accept this unusual testimony, it is obvious from the surrounding circumstances that a debtor, approached by a Sears representative and advised of his or her choice to reaffirm, redeem or surrender the collateral, would assume that Sears' reference to its security interest implied its intention to replevy, absent the debtor's reaffirmation, redemption or surrender of the goods.

[her attorney], or overreaching by Sears for the inclusion of a reference to section 523 in the Reaffirmation Agreement, in the absence of a bona fide claim that Mrs. Hovestadt's obligation to it was nondischargeable." *Id.* Judge Feeney concluded that the debtors' counsel had violated Rule 9011, struck the declaration of attorney, and declared the reaffirmation agreement unenforceable. *Id.* at 386–87.

Following the issuance of the *Hovestadt* decision, the bankruptcy court experienced a noticeable lull in the number of reaffirmation agreements filed by Sears. The reason was made apparent in *In re Latanowich,* 207 B.R. 326, 327 (Bankr.D.Mass.1997). That case arose when Mr. Latanowich, complaining that he was unable to meet the obligations he had reaffirmed and still support himself and his dependents, moved to reopen his case "to seek relief from, among other debts, one to Sears ... that he had listed in his schedules and that appeared to have been discharged." After reviewing the case file and finding no reaffirmation agreement with Sears, Chief Judge Kenner issued an order to show cause why Sears should not be sanctioned for violating the debtor's discharge. *Id.* at 327–28. At the hearing, counsel for Sears stated that because the reaffirmation agreement with the debtor contained the language which Judge Hillman found offensive in *Iappini,* Sears feared that it would incur sanctions by filing the reaffirmation with the court, and so it chose not to. *Id.* at 331. Judge Kenner then expanded her inquiry in time and space. She asked Sears to disclose how many reaffirmation agreements had not been filed on a district-wide basis from the period commencing on January 1, 1995. After some delay, Sears reported that in Massachusetts alone the company had not filed reaffirmations in approximately 2,733 other cases between January 1, 1995 and January 29, 1997. *Id.* at 332.

In the *Latanowich* opinion, Judge Kenner ruled that the validity of reaffirmation agreements was dependent on all of the conditions of § 524(c) being met, one of which is that the reaffirmation be filed with the court. *Id.* at 336; *see* § 524(c)(3). She then held that Sears' collection of the debt violated the dis-

charge injunction, *see* § 524(a), and awarded the debtor compensatory and punitive damages. 207 B.R. at 337–38. She also issued an order to show cause why compensatory and punitive damages should not enter in each of the 2,733 other cases in which Sears failed to file an executed reaffirmation agreement. *Id.* at 338. Class action suits followed in the bankruptcy court and in the United States District Court for the District of Massachusetts, as well as investigations by the United States Attorney for this district and the Attorney General for the Commonwealth of Massachusetts. Ultimately, the class actions were settled, with the district court and the bankruptcy court sitting jointly. See *Conley v. Sears, Roebuck and Co.,* 222 B.R. 181 (D.Mass.1998)(Saris, J.). Sears agreed to pay millions of dollars to resolve what it had described in the bankruptcy court as its "flawed legal judgment." With respect to the investigation by the Massachusetts Attorney General, Sears entered into a "Consent Judgment," which included representations with respect to its prospective reaffirmation practices.

After determining to follow Judge Feeney's holding and reasoning in *Hovestadt,* this Court, commencing in March 1997, began to issue orders to show cause under Rule 9011 to review the § 524(c)(3) attorney declarations filed in connection with reaffirmation agreements. Not all reaffirmation agreements were selected. Excluded were agreements of debtors whose postpetition income clearly exceeded their postpetition liabilities. In those cases, a determination of undue hardship from the reaffirmance of debt was unlikely, since those debtors enjoyed net disposable income. Also excluded were reaffirmation agreements based on the debtor's residence or automobile, because those were items of indisputable necessity and substantial value regardless of the terms offered by the creditor and because failure of the debtor to reaffirm would likely result in foreclosure or replevin. With respect to the remaining agreements, where the debtor reflected postpetition negative cash flow, all were subjected to scrutiny.

Because Sears then, as now, was a major solicitor of reaffirmation agreements in this

District, perhaps the largest solicitor,[13] Sears found itself often at hearings at which § 524(c)(3) attorney declarations in its agreements were the subject of review. However, not even a majority of the total number of Sears agreements were selected for review, nor were only Sears reaffirmation agreements reviewed. Furthermore, oftentimes, after hearing, the Court decided to take no further action with respect to the Sears reaffirmation agreements, relatively satisfied that the declaration of attorney was made with at least a minimally sufficient foundation.[14]

However, with respect to those hearings conducted from mid 1997 through late 1997, a disturbing pattern began to emerge. The hearing would ordinarily open with the Court asking counsel to the debtor to describe the nature of the collateral, its value, and the facts upon which counsel had relied in attesting that reaffirmation of the debt by his or her client with postpetition negative cash flow would not cause the debtor to suffer undue hardship. Regrettably, rarely did counsel to the debtor have the information which the Court sought. Frequently, debtor's counsel could not even identify the collateral, much less opine as to its value. Hardly ever could counsel tell the Court the credit terms on which the reaffirmation was based. What debtor's counsel could tell the Court was that the debtor desperately wanted to retain the consumer goods which constituted the collateral and feared its loss.

Theoretically, counsel's inability to provide the facts underlying the declaration of attorney could (and perhaps should) alone have led to the striking of the § 524(c)(3) attorney declaration and disapproval of the reaffirmation agreement. However, the relevant underlying information (e.g., collateral, value, terms, etc.) was almost always within the knowledge of the creditor representative, who was generally ordered to appear at the show cause hearing. It seemed appropriate, and considerably more equitable to the debtor, for the Court to elicit the necessary information from the creditor. Over time, in order to bring out the issues quickly, the Court began inquiring of the creditor as to some of these underlying facts even before talking to debtor's counsel.

What emerged from these various hearings was a pattern that the Court ultimately determined as being decidedly contrary to both the promotion of Rule 9011 obligations by debtor's counsel and the "fresh start" which Congress intended that individual Chapter 7 debtors enjoy. First, by overlooking the failure of debtor's counsel to perform the necessary investigation before signing the § 524(c)(3) attorney declaration, the Court was, albeit inadvertently, not sufficiently encouraging that attorney's compliance with his or her Rule 9011 obligations. Second, this Court's ad hoc review of § 524(c)(3) attorney declarations in reaffirmation agreements revealed a disparity between the valuation of the collateral and the terms of the reaffirmation agreement. This disparity could be found in many reaffirmation agreements, but was noted most frequently in the Sears reaffirmation agreements because of the frequent insertion of additional credit terms which Sears alone offered. Specifically, the disparity presented itself in one of three ways, the first of which was encountered with reaffirmations with several consumer creditors, while the last two were unique to Sears.

---

**13.** *See* January 14, 1998 Hrg. Tr. at 17 (counsel to Sears stated: "Sears, I believe, does solicit more reaffirmation agreements than any other creditor. There's no question as to the volume of it.").

**14.** According to statistics compiled by the Court, with the assistance of the Clerk's Office, Sears filed 172 reaffirmations before this Court between April 1, 1997 and June 15, 1998. The Court conducted hearings in connection with 65 of the reaffirmations, approximately 38%. The other 107 reaffirmations, approximately 62% of the total filed by Sears, were simply placed in the appropriate case file and allowed to stand after being reviewed in this Court's chambers—although 13 of those were rescinded by the debtors.

Of the 65 reaffirmation agreements whose § 524(c)(3) attorney declarations were reviewed at a hearing, the Court took no further action with respect to 31 of those agreements. Of the 34 remaining agreements (approximately 20% of the total filed), the Court either struck the § 524(c)(3) attorney declarations and voided the agreements (but sometimes because the debtor's counsel failed to appear at the show cause hearing), or the parties amended the agreement in court to reduce the reaffirmed amount.

Some reaffirmation agreements recited the debt to be reaffirmed in an amount totally disproportionate to the replacement value of the collateral. In addition, the replacement value of the collateral was often so low that replevin by the creditor was unlikely. These circumstances were problematic, because if (1) the reaffirmed amount was substantially more than the replacement value of the collateral, (2) replevin was unlikely, and (3) the debtor's postpetition expenses exceeded his or her postpetition income, the § 524(c)(3) attorney declaration—stating that reaffirmation did not impose an undue hardship on the debtor or his or her dependents—was inexplicable. *See generally In re Mayton,* 208 B.R. 61, 66 (9th Cir. BAP 1997) ("Considering that the subject matter of consumer finance transactions not infrequently is the stuff of which garage sales are made, insofar as the property remains viable, while it may be of use to the debtor, its resale value . . . is 'de minimis.' ").

Some reaffirmation agreements to which Sears was a party included the foregoing valuation problems, but also reinstated the debtor's credit line with Sears up to the amount of the reaffirmed debt. Theoretically, this provided an additional benefit for the debtor, since, as the principal of the reaffirmed debt was reduced, the debtor's credit facility would grow accordingly. But the size of the interest rate on the reaffirmed debt (Sears charges 21% per annum [15]), combined with the small minimum payment (which the debtor would already have to struggle to make), made it considerably unlikely that the principal of the reaffirmed debt could be meaningfully reduced for a substantial period of time. And, if the principal could not be reduced, the reinstatement of the credit line would be of illusory benefit, while the debtor still reaffirmed a debt greater than the value of the underlying collateral. *See Bruzzese,* 214 B.R. at 449 (debtor was not told that satisfying the reaffirmed debt of $1,800 on

the terms offered by Sears, if paid at the rate stated in the reaffirmation, would take 76 months and cost her almost $1,500 in interest); *In re Hopkins,* 1997 WL 803718, at *1 (Bankr.W.D.Mich. Dec. 24, 1997) (reaffirmation of the particular debt before the court on terms proposed by Sears would result in negative amortization, causing the debt to actually increase over time notwithstanding no payment default).

In still other reaffirmation agreements where collateral valuation was frequently suspect, the debtor was offered not only reinstatement of the credit line, but also an additional line of credit in excess of the reaffirmed debt. This was facially very attractive to debtors who feared they would have difficulty obtaining new credit upon their emergence from bankruptcy. However, such a credit facility required that the debtor reaffirm the full prepetition debt owed to Sears, notwithstanding the debt's possible discordance with the value of the underlying collateral and the debtor's stated inability to meet his or her postpetition obligations. Furthermore, the purported transaction raised still more difficult questions as to what factors debtor's counsel was considering when signing the declaration of attorney. If the debtor's representations in Schedules I and J (signed by the debtor, but also filed by debtors' counsel) were accurate, the debtor could not meet his or her needs postpetition as they were *then* projected. On what basis and for what reason would counsel to the debtor conclude that Sears, a sophisticated lender, was willing to extend credit to a person who demonstrated an inability to repay right from the loan's inception, other than to provide an irresistible incentive to a debtor to sign an agreement otherwise not in his or her best interest?

Each of the foregoing issues raised questions as to the Rule 9011 implications of the § 524(c)(3) attorney declarations, and for the

---

**15.** That rate is in excess of the amount which would constitute usury in Massachusetts, *see* Mass. Gen. Laws Ann. ch. 271, § 49 (West.1990), unless Sears first registered with the Commonwealth of Massachusetts Attorney General or unless Sears enjoyed an exemption. Sears claims to enjoy an exemption because its credit card is issued by the Sears National Bank.

It is also unclear whether interest is calculated on the original principal or on the total reaffirmed amount. If the latter is true, the total interest rate may be much higher since it may consist, in part, of interest upon interest.

reasons set forth above, the determinations made by debtor's counsel were inextricably intertwined with the positions and practices adopted by the respective consumer creditors, most often Sears. When these issues were raised at non-evidentiary Rule 9011 show cause hearings with the debtor's counsel, there was a frequent shift of position not only by the debtor's counsel, but also by the creditor. Many times, the creditor's counsel would readily admit that the collateral had no value to the creditor and/or that the creditor would likely not exercise rights of replevin if the reaffirmation were rescinded by the debtor, or the creditor would concede a considerably lower valuation for its collateral.[16] The creditor would then withdraw from the reaffirmation agreement, or counsel to the debtor would obtain the creditor's rapid assent to a reduction of the reaffirmed debt or recommend rescission to the debtor.

Although in some sense, the foregoing show cause hearings traveled a substantial distance toward the goal of effectuating the Congressional intent in formulating § 524(c), they failed to reduce the frequency of Rule 9011 problems with reaffirmation agreements. These limited show cause hearings produced little of the beneficial effect of the prospective relief granted, sanctions threatened, or guidelines provided in *Iappini, Hovestadt,* and *Bruzzese.*

### B. Prior Proceedings in the Instant Cases

#### 1. The Debtors

Before going further, this Court will set forth who these debtors are, or perhaps more accurately, who these debtors appeared to be from a review of their schedules, and what their reaffirmation agreements sought to accomplish.

Ana Melendez filed her Chapter 7 petition on August 12, 1997. Her Schedule I revealed that her only income is the $434 she receives each month from Aid to Families with Dependent Children ("AFDC"), and that she supports one grandson. Her expenses total the sum of $508, resulting in a monthly deficit of $74. The Sears collateral at issue is a refrigerator, purchased by Ms. Melendez on April 20, 1997 for the sum of $414.90. Sears valued the used refrigerator in the sum of $319.47. At the § 341 meeting, Ms. Melendez entered into a reaffirmation agreement with Sears, agreeing to pay Sears the sum of $319.47, payable at $12 per month beginning December 25, 1997.[17] By this Court's calculation, assuming that Ms. Melendez did, and was able to continue to, make the minimum payment, she would have paid off the debt, accruing interest at 21%, in 3 years, having paid a total of $433.79. Through his declaration of attorney, counsel to Ms. Melendez certified to this Court that by reaffirming the debt to Sears, Ms. Melendez would not suffer an undue hardship and that he had fully advised the debtor of the legal effect and consequences of the agreement and any default thereunder.

Linda Spencer filed her Chapter 7 petition on June 9, 1997. She listed two sons and a "daughter plus her infant" as dependents. She states in an affidavit supplied to the Court that she could not work outside of the home because one of the children under her care has "special needs." Ms. Spencer's schedules indicated that she had no income,[18]

---

**16.** For example, in connection with one Rule 9011 show cause hearing in Springfield, held on June 24, 1997 and attended by Sears current counsel, Sears advised the Court that the collateral to be retained by the debtor in return for the debtor's execution of the reaffirmation agreement under consideration included the debtor's eyeglasses. The Court asked Sears counsel when the eyeglasses had been purchased, their original purchase price, and their value according to Sears. Sears' counsel reported that the eyeglasses had been purchased in November 1996 for $303, and were now valued by Sears in the amount of $280. The Court then asked Sears' counsel if *he* would pay $200 for those used eyeglasses. Sears' counsel, appearing bemused,

answered in the negative, "based on [his] knowledge, which is lay knowledge." Shortly thereafter, Sears reduced its asserted valuation of the eyeglasses to $120.

**17.** Sears claims that it solicits reaffirmation agreements from persons on public assistance to avoid criticism that otherwise Sears would be discriminating against them.

**18.** In an affidavit filed on September 25, 1997 and at the March 5, 1998 hearing in connection with these matters, Mrs. Spencer testified that her husband assists her with her expenses, including the debt to Sears. However, the dollar amount of that assistance was not specified.

while her monthly expenses were $2,052. According to information provided by Sears, Sears claims a security interest in four items which Ms. Spencer purchased with her Sears Card in September and October of 1996. Those items, with their purchase prices and the "current value" reported by Sears, are as follows: a drill, bought for $136.49 and valued at $109.19; a washer, purchased for $517.18 and listed as being worth $413.74; a microwave, purchased for $157.21 with a reported current value of $125.77; and a mower, bought for $198.32 and valued at $158.66. Ms. Spencer entered into a reaffirmation with Sears on July 24, 1997 (the date of her § 341 meeting) for the full amount of the "current value" of each of these items, as determined by Sears, for a total of $807.36, payable at $20 per month. By this Court's calculation, assuming that Ms. Spencer did, and was able to continue to, make the minimum payment, she would have paid off the debt, accruing interest at 21%, in almost 6 years, having paid a total of $1,413.01. Through her declaration of attorney, counsel to Ms. Spencer certified to this Court that by reaffirming the debt to Sears, Ms. Spencer would not suffer an undue hardship and that she had fully advised the debtor of the legal effect and consequences of the agreement and any default thereunder.

Sheila Lafleur filed for relief under Chapter 7 on August 11, 1997. Her bankruptcy schedules indicated that Ms. Lafleur was divorced, supported two minor children, and had total monthly income of $1,232, comprised of Social Security Disability payments ($595), AFDC ($486), and food stamps ($151). Her monthly expenses were reported as $1,429, leaving her with a $197 monthly deficit. The Sears collateral is as follows: A "cardiofit," bought in February 1997 for $209.99, valued by Sears at $134.39; a snow-thrower, bought in December 1996 for $420.75, valued at $286.11; a vacuum cleaner, bought in October 1996 for $202.97, valued at $166.43; and a dehumidifier, purchased for $209.99 in October 1996, valued at $161.69. The reaffirmation was entered into on October 6, 1997, the same date as the § 341 meeting. It calls for monthly payments of $18, and the reaffirmed debt is set at $700, $48.62 less than the sum of the "current

values" Sears attributed to the four above-mentioned items. By this Court's calculation, assuming that Ms. Lafleur did, and was able to continue to, make the minimum payment, she would have paid off the debt, accruing interest at 21%, in 5 and one-half years, having paid a total of $1,184.05. Through his declaration of attorney, counsel to Ms. Lafleur certified to this Court that by reaffirming the debt to Sears, Ms. Lafleur would not suffer an undue hardship and that he had fully advised the debtor of the legal effect and consequences of the agreement and any default thereunder.

Dana Callahan filed a Chapter 7 petition on August 19, 1997. Mr. Callahan listed his occupation as a truck driver, with net monthly income of $2,071.81. He supports only himself. His monthly expenditures were listed as $2,341, but that was shown later to be an error. Although his expenses were really $1,901, leaving him with a surplus, a facial examination of Schedules I and J seemed to reveal a monthly shortfall of $269.19. Information provided by Sears pursuant to the show cause order revealed that Sears claims a security interest in a "table/chest/night stand" which Mr. Callahan purchased in December 1995 for $1,065.50. Sears reported that its value was $330.31, but on September 27, 1997, Mr. Callahan agreed to reaffirm the sum of $2,429.82, in monthly payments of $58. Sears promised to provide Mr. Callahan with an additional line of credit in the amount of $500.00. In an affidavit filed with the Court, Mr. Callahan testified that he required the additional credit as a condition of retaining his employment. By this Court's calculation, assuming that Mr. Callahan did, and was able to continue to, make the minimum payment, he would have paid off the debt of $2,429.82 (not including the additional $500 line of credit), accruing interest at 21%, in 76 months, having paid a total of $4,416.31. Through her declaration of attorney, counsel to Mr. Callahan certified to this Court that by reaffirming the debt to Sears, Mr. Callahan would not suffer an undue hardship and that she had fully advised the debtor of the legal effect and consequences of the agreement and any default thereunder.

Robert Belisle filed a Chapter 7 petition on May 27, 1997. In his original schedules, he listed net monthly income of $527.71, and monthly expenses of $581.82 (net of credit card payments), for a monthly deficit of $54.11. Information provided by Sears in January 1998 reveals that Sears only claims a security interest in a VCR purchased by Mr. Belisle in December 1996 for $199.99. Sears assigned a current value to the VCR of $73.99. Mr. Belisle entered into a reaffirmation with Sears on the date of his section 341 meeting, July 18, 1997. Pursuant to his reaffirmation, Mr. Belisle agreed to reaffirm $629.18, the entire balance he owed Sears, according to its records,[19] in monthly payments of $15, in return for which Sears agreed to provide a line of credit of $1,129.00 (i.e., an additional $500). By this Court's calculation, assuming that Mr. Belisle did, and was able to continue to, make the minimum payment, he would have paid off the debt of $629.18 (not including the additional $500 line of credit), accruing interest at 21%, in 6 years and 4 months, having paid a total of $1,145.11. Through his declaration of attorney, counsel to Mr. Belisle certified to this Court that by reaffirming the debt to Sears, Mr. Belisle would not suffer an undue hardship and that he had fully advised the debtor of the legal effect and consequences of the agreement and any default thereunder.[20]

Carla Crooks filed a Chapter 7 petition on August 19, 1997. She supports one child. She reported no monthly income,[21] and monthly expenses of $1,461 (net of credit card payments). Information provided by Sears shows that Sears considers itself secured in the amount of $399.05, based on Ms. Crooks' October 1996 purchase of a refrigerator for $738.98. On the date of her § 341 meeting, October 15, 1997, Ms. Crooks entered into a reaffirmation with Sears. The agreement calls for monthly payments of $24 and a total reaffirmed amount of $995.05,

with Ms. Crooks getting a $995 line of credit reinstated. By this Court's calculation, assuming that Ms. Crooks did, and was able to continue to, make the minimum payment, she would have paid off the debt of $995.05, accruing interest at 21%, in 6 years and 4 months, having paid a total of $1,788.75. Through her declaration of attorney, counsel to Ms. Crooks certified to this Court that by reaffirming the debt to Sears, Ms. Crooks would not suffer an undue hardship and that she had fully advised the debtor of the legal effect and consequences of the agreement and any default thereunder.

The Joyces filed for relief under Chapter 7 of the Code on July 28, 1997. They support four minor children. Their schedules reported joint monthly income of $2,103.42 and monthly expenses of $2,465.70, leaving a monthly deficit of $362.28. Sears collateral consists of a stove purchased in November, 1996 for the sum of $880, which Sears values at $616. On October 10, 1997, approximately a month after the section 341 meeting, Ms. Joyce agreed to reaffirm the sum of $975.20 with Sears, in monthly installments of $24, and Sears agreed to reinstate a line of credit in the amount of $975.20. By this Court's calculation, assuming that Ms. Joyce did, and was able to continue to, make the minimum payment, she would have paid off the debt of $975.20, accruing interest at 21%, in 6 years, having paid a total of $1,717.67. Through her declaration of attorney, counsel to Ms. Joyce certified to this Court that by reaffirming the debt to Sears, Ms. Joyce would not suffer an undue hardship and that he had fully advised the debtor of the legal effect and consequences of the agreement and any default thereunder.

The Waylands filed for relief under Chapter 7 on October 27, 1997. They reported total combined monthly income of $3,625, and

19. According to the Debtor's schedule F, filed with his bankruptcy petition, he owed Sears $596.57.

20. On November 6, 1997, the day after the first hearing held in connection with this reaffirmation agreement, Mr. Belisle filed a motion to amend his Schedules I and J to reflect a new job, increasing his net monthly income to $780, leaving Mr. Belisle with a monthly surplus of $183.18.

21. Ms. Crooks testified on March 11, 1998 that she was receiving "public assistance" when she completed her Schedules I and J, although she subsequently obtained part-time employment. Thus, her schedules would appear to have been inaccurate, although it is unclear by how much.

total monthly expenses of $3,878, for a monthly deficit of $253. Sears claimed a security interest in two items that Donald Wayland had purchased—a VCR and an air conditioner. The VCR was purchased in August 1997 for $399.99, and Sears claimed that it was worth $156 at the time of reaffirmation. The air conditioner was purchased in July 1995 for $422.99, and Sears valued it at $219.95. The Waylands' § 341 meeting was held on December 15, 1997, and on that same date, Mr. Wayland entered into a reaffirmation with Sears for the sum of $375.95, with a monthly payment of $13.[22] By this Court's calculation, assuming that Mr. Wayland did, and was able to continue to, pay $13 per month, he would have paid off the debt of $375.95, accruing interest at 21%, in 3 years and 5 months, having paid a total of $528.60. Through her declaration of attorney, counsel to Mr. Wayland certified to this Court that by reaffirming the debt to Sears, Mr. Wayland would not suffer an undue hardship and that he had fully advised the debtor of the legal effect and consequences of the agreement and any default thereunder.

### 2. The Non–Evidentiary Hearings

On October 8, 1997, the Court held a hearing on the reaffirmation agreement between debtor Linda Susan Spencer and Sears. The Court asked counsel to Sears whether Sears had any intention to foreclose on its collateral if the reaffirmation was voided. After counsel indicated that she did not think a decision had been made on that issue, the Court advised her that the information was necessary to its Rule 9011 determination, and continued the hearing to October 22, 1997 (later continued at Sears' request to November 5, 1997) so that Sears would have time to collect it. In earlier hearings over the past months, Sears had repeatedly represented to the Court that, in the wake of *Latanowich,* new instructions to its representatives as to their

negotiations with debtors at § 341 meetings (presumably with respect to the replevin and valuation determinations which the Court found critical in its Rule 9011 deliberation) were in the offing, but were still under review by Sears at the national level. This Court expressed frustration with Sears delay in identifying and implementing the new procedures. The Court referred to bankruptcy court orders then reported out of the Central District of California, and warned that analogous orders could result here from Sears inaction. The Court recommended strongly that Sears attempt to resolve some of the reaffirmation issues by entering into discussions with the United States trustee for this Region (Region 1)(the "United States Trustee").

The next hearings were held on November 5, 1997, in the *Spencer, Melendez, Belisle,* and *Crooks* cases. At that hearing, counsel to Sears informed the Court of certain changes in its reaffirmation procedures. Those changes were reportedly instituted in connection with (1) the settlement of the class action suit described above, and (2) consent decrees with the Attorneys General of several states, including Massachusetts.

Sears' counsel then reported, inter alia:

The consent judgment with Massachusetts also prohibits Sears from representing or implying that non-payment of any debt will result in effectively repossessing collateral unless Sears intends to take that action and the action is not prohibited by law. In order to implement that provision of the consent judgment, the Sears personnel have been instructed at 341 meetings to respond to an inquiry as to whether or not Sears will repossess the property that is the collateral for the debt if the debt is not reaffirmed to answer that no, they don't know what Sears will do unless, in fact, a specific decision has been made

---

**22.** The Court based its calculation on a monthly payment of $13 even though the reaffirmation signed by Mr. Wayland, unlike its counterparts, does not designate a monthly payment amount. Instead, it provides:

The first monthly installment will not exceed $13.00.... Subsequent monthly installments shall be due the 4th day of each month as long as there remains an outstanding balance. The

terms set forth in this paragraph are a summary of the terms of the account agreement, as amended, between Sears and me. Sears and I agree to be bound by the terms of the account agreement.

Thus, it is unclear whether payments might increase after the first payment. If they do, payment difficulties may obviously grow worse.

whether or not to repossess or to not repossess.

Subsequent to April of '97 when the failure to file reaffirmation agreements came to light, Sears retained the accounting firm of Deloitte & Touche to update its valuation schedules. I know that has been a concern of this Court. Deloitte & Touche has sought to obtain Bluebook-type equivalent information about various categories of used consumer goods.... And those new valuation schedules were disseminated to the Sears recovery personnel on October 1st.

Sears also hired the consulting arm of Arthur Anderson to review the 341 processes and to put in place, to come up with policies and procedures that will allow Sears to monitor the activity of its personnel at the 341 meetings and to put together training programs in order to implement the provisions of the consent decree.

Tr. of Nov. 5, 1997 Hrg. at 7–8. Sears' counsel also announced new policies already or soon to be implemented, changing how Sears representatives communicated with debtors represented by counsel, and reducing the types of collateral which could serve as the basis of reaffirmation agreements.

The Court then thanked Sears' counsel for the report, but identified three remaining "primary" problems which the Court believed impacted on § 524(c)(3) attorney declarations and arose where a debtor's postpetition expenses exceeded his or her postpetition liabilities. First was the issue presented when the amount to be reaffirmed was substantially higher than the amount of the secured claim, particularly when there were problems valuing the creditor's collateral. Second was the issue presented if Sears declined to disclose to debtors whether Sears would or would not replevy (especially where the value of the collateral was so low that, in light of recovery costs, the collateral had no value to Sears but was a necessary for the debtor or the debtor's dependents). And third was the issue presented when Sears offered an additional line of credit to debtors who could not afford to repay, in order to induce the debtor to reaffirm debt for an amount in excess of the value of the Sears collateral. Counsel to Sears noted that he had met with the United States Trustee and that their discussions were ongoing. The Court encouraged the continuation of those discussions, and continued the hearings to December 10, 1997.

Initial hearings were subsequently held in the *Lafleur, Joyce,* and *Callahan* cases, all of which were continued to the date of the hearings in the previously-mentioned cases. The *Wayland* case was added later.[23] Pursuant to a motion by Sears, all these matters were eventually continued to January 14, 1998, Sears having represented that its conversations with the United States Trustee required more time. In connection with that request, Sears announced a new policy. Pending further determination by Sears, it would not replevy any goods from Massachusetts debtors represented by counsel.[24] However, it would not volunteer that information to debtor's counsel. Only if Sears were specifically asked, would it disclose that its right to replevy was waived. This "if you don't ask me, I don't have to tell you" policy continued until the late spring of 1998.

At the January 14, 1998 hearing, the Court was informed that conversations between the United States Trustee and Sears had stalled. The United States Trustee had filed an extensive report, explaining where progress

---

**23.** Sears contends that these cases were handpicked. Of course this Court selected them, just as it selects all matters that are set for hearing *where one is not mandatory.* The selections were made from those reaffirmations immediately before the Court, with no assurance as to where evidence would lead or what relief, immediate or prospective, would be granted. Ironically, the Callahan case, one in which circumstances surrounding execution of the reaffirmation agreement appeared to be particularly egregious, may turn out to be one in which an error or omission by the debtor on Schedule J, has already led the Court to conclude that the reaffirmed amount can be paid by the debtor out of his disposable income. If so, this Court has no role to play. As before stated, payment of reaffirmed debt cannot constitute an *undue hardship* where the funds come from disposable income. *See* § 524(f).

**24.** In an earlier hearing, Sears' counsel had already advised the Court that, pending further determination, it would not accept reaffirmation agreements from pro se debtors. *See* Tr. of Nov. 5, 1997 Hrg. at 9–10.

had and had not been made in its discussions with Sears, raising questions with respect to the reaffirmation agreements under review in terms similar to the issues raised by the Court, explaining the Executive Office of the United States Trustee's interest in these issues on a national basis, and urging the adoption of a local rule in Massachusetts, substantially along the lines suggested in *Bruzzese* (compelling significant creditor disclosures in connection with each proposed reaffirmation agreement). What followed was a long and detailed colloquy between this Court and counsel for Sears. That colloquy covered all of the issues mentioned above, together with others (e.g., standing, and case and controversy concerns). However, at no time did Sears explicitly or implicitly suggest that this Court was unfairly biased or prejudiced with respect to Sears within the meaning of § 455. Rather, the quality of the discourse was civil and constructive. Ultimately, the Court took the matters under advisement, with an indication that the Court might need to take evidence with respect to the reaffirmation agreements under review.

Ultimately, this Court determined that it was unable to make a final determination with respect to the Rule 9011 issues without the taking of evidence. On February 11, 1998, the Court issued an order in all eight of these cases. The order consolidated these matters in the interest of judicial economy and set evidentiary hearings for March 2, March 5, and March 11 of 1998. Sears was ordered to produce for examination on the first hearing date "any and all of its agents or employees who participated in any way in the negotiation and/or approval of any of the Reaffirmation Agreements." The debtors and their counsel were ordered to appear at the second and third hearing dates. The order further stated:

Pursuant to Fed. R. Bank[r]. P. 9011(a), the Court shall inquire as to whether grounds exist for the imposition of sanctions under the said rule, including, without limitation, the striking of the said declarations of attorney. Counsel for any of the parties, including Sears and counsel for the United States Trustee, shall be invited to inquire of any of the witnesses.

February 11, 1998 Order at 3.

### 3. The Evidentiary Hearings

On March 2, 1998, the Court took testimony from the five Sears representatives who had been involved with the reaffirmation agreements of these debtors.[25] The Sears representatives testified as to their training, the procedures they followed at § 341 meetings, and their memories of the reaffirmation agreements now before the Court. None could remember any of the debtors. They described the information regularly received from Sears in advance of the § 341 meeting, including form reaffirmation agreements, a listing of the debtors to which they had been assigned, a listing of the collateral held by each debtor, and the collateral value as determined by Sears. Each representative had been supplied with the valuation chart which Sears' counsel had described to the Court during the November 5, 1997 hearing. None had received any information as to the debtor's wherewithal to meet the obligations under the reaffirmation agreement, and none believed that it was his or her obligation to determine that information, or that Sears was eager for such an inquiry. As noted above, each claimed never to have threatened repossession of collateral in order to induce the execution of a reaffirmation agreement. And finally, each claimed not to have entered into any reaffirmation agreements for a debt-

---

25. In the Recusal Motion, Sears complains that the Court made inquiry of the witnesses. However, before commencing, the Court indicated to Sears' counsel that it contemplated asking the Sears representatives to take the stand, with the Court inquiring on the relevant issues and then affording to counsel to the United States Trustee and to counsel to Sears an opportunity to inquire. The Court then asked Sears' counsel if that procedure was acceptable. Sears' counsel responded "That sounds fine, your Honor." During the course of the Court's inquiry, counsel for Sears raised only occasional objections to questions asked by the Court, either for technical reasons or on the grounds of relevance. Each such objection was carefully considered and ruled upon with an appropriate explanation. Some of the Sears objections were overruled; others were sustained, frequently with the Court's apology.

or assigned to *this* Court since the fall of 1997.[26]

On March 5 and 11, 1998, the Court took testimony from each of the debtors whose reaffirmation agreements are the subject of the current inquiry, as well as from each of the attorneys whose § 524(c)(3) declarations are in question. This Court need not, and should not, tarry here in describing that testimony. It is sufficient for these purposes to say that, to a greater or lesser extent, some or all of the debtors were unable to recall receiving critical information which should have been disclosed to them; and that, to a greater or lesser extent, each of the attorneys conceded not obtaining or providing the debtors with that information. However, because any Rule 9011 inquiry must not lose sight of the context, and because the evidentiary hearing was interrupted by the instant Motion for Recusal and the United States Trustee has not yet had the opportunity to submit evidence which he thought bore on these issues, the Court should not now draw conclusions as to which if any of the declarations of attorney must be struck or whether other relief should be granted.

On March 13, 1998, the Court took testimony from a very important witness, Ms. Debra DeGrenier, the Recovery Manager of the Boston Regional Credit Card Operations Center (the "Boston RCCOC"),[27] located in Salem, Massachusetts. As the Recovery Manager, Ms. DeGrenier is subordinate at the Boston RCCOC only to a Mr. George Fitzgerald, who is the most senior member of the staff. Mr. Fitzgerald in turn reports to a Mr. Elvis Schmiekedamp, who is the National Director of Recovery for Sears and is stationed in the Chicago office.

Ms. DeGrenier testified as to her training and to the procedures of her office. *See* Tr. of March 13, 1998 Hrg. at 30–110. She also testified to the training of and procedures employed by the Sears representatives who attend § 341 meetings on Sears' behalf. *Id.* She verified Sears' intention to pursue reaffirmation agreements for each of its customers who file for bankruptcy protection, excepting those where Sears cannot verify its consumer lien [28] and those where the debtor's actions are deemed abusive. *Id.* at 41–42, 89–90. In the latter instance, non-dischargeability actions are considered. Her testimony also corroborated that of the Sears representatives regarding the list of credit options afforded to reaffirming debtors, and confirmed that the debtor's ability to repay the reaffirmed amount is not a factor which Sears considers, where the debtor is represented by counsel.[29]

As Recovery Manager, Ms. DeGrenier was, and is, that person at the Boston RCCOC who makes the final decision as to which goods should be replevied. She testified that, from January 1996 through the fall of 1997, she could not recall ever having referred a matter to counsel to institute a replevin action where the value of the merchandise did not exceed $300. *Id.* at 65–66.

---

**26.** Indeed, the later testimony of Debra DeGrenier, Recovery Manager of the Salem office in charge of Sears operations in fourteen states, confirmed that, in the fall of 1997, Sears decided to halt the solicitation of all reaffirmation agreements in cases assigned to this individual judge. This Court's review of the Clerk's files further confirms that no reaffirmations have been filed since that time. According to Ms. DeGrenier, the same decision was made with respect to only one other judge under the Salem office's coverage—Judge Stanley Bernstein, the author of *Bruzzese.*

**27.** The Boston RCCOC covers the fourteen states of Connecticut, Delaware, Maine, Massachusetts, New Hampshire, New Jersey, New York, North Carolina, Rhode Island, Pennsylvania, Rhode Island, Tennessee, Vermont, West Virginia, as well as Washington, D.C. There are nine (9) such regional centers in the United States.

**28.** Ms. DeGrenier claimed that, since mid–1997, Sears has not solicited reaffirmation agreements in Massachusetts from debtors where the debt is unsecured or Sears cannot locate its lien documentation. Tr. of Mar. 13, 1998 Hrg. at 89–90.

**29.** Prior to September 1997, Sears used the same procedure for pro se debtors. It did not check their Schedules I and J to determine their ability to pay. Sears relied on the bankrupt debtors to make that determination for themselves. Tr. of Mar. 13, 1998 Hrg. at 54. However, Ms. DeGrenier testified that Sears had changed that policy and that henceforth, the Sears representative at the § 341 meeting will make a determination as to whether pro se debtors have the ability to pay reaffirmed debt. *Id.* at 55. Training of the Sears representatives for that task was estimated to take one-half of a day. *Id.* at 56.

She also indicated that $500 was the average minimum for such a referral, because of factors such as the costs of collection. *Id.* at 66. DeGrenier also described the new "Sears Replevin Policy," the new procedures which counsel for Sears had described to the Court in the fall of 1997. As set forth above, information about these policies is essential to future Rule 9011 determinations. If counsel's rationale for signing the § 524(c)(3) declaration is that the debtor desires to retain consumer goods because he or she believes them to be necessary, it must follow that counsel is obliged to consider whether the creditor will realistically repossess the goods if they are not surrendered or if a reaffirmation is not agreed to. With a creditor such as Sears, who by its own admission solicits the largest number of reaffirmations in the district, *see* Tr. of Jan. 14, 1998 Hrg. at 17, the particular practices of the creditor influence the § 524(c)(3) attorney declaration. That is, if the debtor's counsel has developed an understanding through prior dealings with the creditor or through the creditor's written policies that it will (or at least threatens to) repossess consumer goods unless a reaffirmation agreement is executed, the attorney's decision to sign the § 524(c)(3) declaration is critically impacted.

The Sears Replevin Policy is relevant to this inquiry in a number of respects. First, the policy states that it is intended to exclude from risk of replevin items that Sears believes would adversely affect the health and safety of its customers. Goods used for medical purposes, such as eyeglasses and hearing aids, infant furniture and used automobile tires and parts are indeed now excluded. *Id.* at 60–61, 70–71. However, Ms. DeGrenier testified that the replevy of other items likely deemed by debtors as necessaries for their survival such as stoves, refrigerators, and adult and children's furniture (excluding infants) are not believed by Sears as affecting their health and safety. *Id.* Also, two other aspects of the new Sears policy seems to bear mightily on debtor's counsel's decision-making in signing the § 524(c)(3) declaration. First, the new Sears policy does *not rule out* replevy regardless of the value of the merchandise. Rather, it sets forth various discretionary factors that will be taken into account in the replevy decision.[30] Second, the new policy precludes the replevin decision being made until after the § 341 meeting. Therefore, at the time of the § 341 meeting, when almost all of the Sears reaffirmation agreements are executed, the Sears representative would be unable to advise a debtor's counsel whether replevin would or would not occur, absent surrender, redemption or reaffirmation.[31]

On April 2, 1998, this Court took testimony with respect to the new valuation chart that Sears had developed in 1997 and employed since October 1, 1997. Such testimony was critical to the Rule 9011 inquiry, since it is Sears' practice to include those valuations in letters sent to debtors or their counsel shortly before the § 341 meeting. To the extent that the valuations, characterized in the Sears letter as "current values," are relied upon by the debtors or their counsel, without challenge, the validity of the valuations is interrelated with the propriety of debtor's counsel's reliance thereon in signing the § 524(c)(3) declaration. With respect to the instant inquiry, the new valuation tables were used by Sears in the *Melendez, Lafleur, Crooks, Joyce,* and *Wayland* cases. Tr. of Apr. 2, 1998 Hrg. at 13.

---

**30.** For example, the Sears Replevin Policy specifically states that a factor in the replevy decision is whether the debtor was rude to the Sears representative. And Ms. DeGrenier confirmed that "rudeness" would include the refusal to speak to the Sears representative, if the representative wanted to talk to the debtor about entering into a reaffirmation agreement. Ms. DeGrenier also confirmed that the new policy is intended to be more aggressive than its predecessor.

**31.** This policy is of particular interest in light of the recent consent judgment between Sears and the Massachusetts Attorney General. In that judgment, Sears promised that its representative would not threaten replevin if Sears had already made a decision not to replevy. Sears' new policy delays the Sears replevin decision until after the § 341 meeting where most reaffirmation agreements are executed. And after execution of the agreement, Sears has no reason to make the replevin decision. Therefore, under the new policy, the debtors who sign reaffirmation agreements will never learn Sears' true intention.

Although referred to as valuation tables, the tables do not value any specific item. Rather, they are depreciation schedules. Goods sold by Sears are organized into categories, called "Divisions." There are only 18 Divisions of "secured merchandise," subject to replevy by Sears.[32] For each Division, a depreciation schedule is set forth in increments of one year. With limited exception, no distinction is made for items within a Division. For example, within the Home Electronics Division, a basic 13-inch television is depreciated at the same rate as a 37-inch television and a portable clock radio. Within the Hardware Division, a set of mechanic's tools is depreciated at the same rate as a power saw, or a compressor. Nothing in the schedule factors for breakage or unusual obsolescence issues. The actual valuations, described as "current values" in letters sent to debtors or their counsel, are determined by simply applying these depreciation schedules to the original purchase price of the Sears collateral.

At the outset of the April 2 session, counsel to Sears advised the Court that the valuation tables had been prepared from two sources. Some information had been drawn from the *Blue Books* (published by Orion Research Corporation), and the balance drawn from information supplied by Deloitte & Touche, a national accounting firm. Specifically, Sears' counsel stated:

> [F]or those goods for which there *was* *Blue Book* information about the value of used goods, Mr. Seltzer [of Sears] reviewed that information and compiled the data that forms the basis for the valuation charts relating to *Blue Book* material. For goods for which there *was not Blue Book* information available, Deloitte &

Touche supplied to Sears information as to the values of those various categories of goods for which the *Blue Book* information was not available. Mr. Seltzer took that information from Deloitte & Touche and included it in the valuation tables.

Tr. of Apr. 2, 1998 Hrg. at 13–14.[33]

Two witnesses then testified as to the valuation tables. First was James Vincent Nash, a senior consultant in the machinery and equipment division of Deloitte & Touche. He testified that his office was retained by Sears in the summer of 1997 to develop information for its new reaffirmation valuations. Deloitte & Touche was unable to provide Sears with information regarding the goods in all of the Sears Divisions. As to the goods in those Divisions for which he had supplied Sears with information, Mr. Nash testified with respect to his valuation methodology. He had developed three depreciation "curves" for each of those Divisions. According to Mr. Nash, two of those curves, the "Iowa Curve" developed from a treatise named *Engineering Valuation and Depreciation,* and a curve developed from the *Marshall & Swift Valuation Service Manual,* had been commercially developed to value tangible personal property (although not consumer goods, per se). The third curve was developed by Deloitte & Touche personnel. Two firm employees had visited approximately fourteen appliance stores in northern New Jersey[34] and compiled information on prices for the used goods they could locate. None of the stores were part of a national chain. The prices of approximately 75–100 different items (among the thousands sold by Sears) were tested. In most cases, a particular item was not found in more than one store. How-

---

**32.** The Divisions include Home Furniture, Home Office, Costume Jewelry, Sporting Goods, "Homeware/RTA Furniture," Hardware, Luggage, Floorcare/Sewing, Cooking and Cleanup, Laundry, Battery Chargers/Converters, Paint, Seasonal Shops, Fine Jewelry, Food Storage, Furniture/Toys, Home Electronics, and "Lawn, Garden, Patio."

**33.** As will be noted below, this statement made by Sears' counsel, although consistent with a similar statement made to this Court by the same counsel at an earlier hearing, *see* Tr. of Nov. 5, 1997 Hrg. at 7–10, was a misstatement. As will be detailed below, depreciation schedules with

respect to at least two Divisions were drawn from considerably less reliable sources. Whether counsel's misstatements were inadvertent or intentional or whether he was misled by his client is not the subject of the current inquiry.

**34.** Mr. Nash did not explain why this market test for the development of a national valuation standard was undertaken only in the northern part of the State of New Jersey. And, curiously, no data was taken from Sears' own experience with the sale of used merchandise. Mr. Nash did not know whether Sears resells returned goods.

ever, a curve was developed from those findings.

Upon completion of the three "curves" set forth above, depreciation tables for each curve in each Division were created by averaging the useful lives of the goods enumerated within each Division. The tables were then submitted to Mr. Flaherty of Deloitte & Touche, a member of the Sears valuation team described below. Although Mr. Nash believed the Iowa Curve to be most indicative of the true depreciation schedule for the goods evaluated, the depreciation tables were submitted without analysis and without strong recommendation. Further, Mr. Nash was unable to advise the Court which of those tables, if any, were ultimately incorporated in Sears' valuation tables now before the Court.[35]

Next to testify was Mr. Gary Seltzer, an employee of Sears. Mr. Seltzer is an accountant and financial analyst by training and experience. He had no previous experienced in valuing consumer goods. In the summer of 1997, he joined a team assigned by Sears to develop the valuation tables. Other members of the team included Elvis Schmiedekamp, the Sears National Manager of Recovery, Michael Vinn and William Baker, in-house counsel to Sears, James Flaherty from Deloitte & Touche and two attorneys retained by Sears, including Mr. Riccardo Kilpatric.

Mr. Seltzer was given the task of developing the values from the *Blue Books*. As best this Court can understand his technique, Mr. Seltzer began by identifying the various brands sold by Sears. Then he extracted from the *Blue Books* both the "retail new" and "retail used" valuations for a representative number of those brands. (On a "retail basis" only those two values were offered.) Unfortunately for Mr. Seltzer's purposes, the *Blue Books* value both goods currently being manufactured and those which have been discontinued. Further, according to Mr. Seltzer, the *Blue Book* valuations for used goods do not provide information as to *how long* those goods have been used. Therefore, Mr. Seltzer fixed on the following methodology. Where the brand was still being manufactured, he would assume that the valuation for used goods reflected goods only one year old. Where the brand had been discontinued, Mr. Seltzer assumed that the stated valuation for new goods was the price for which the goods were sold in the last year of their manufacture. Then, assuming that Sears would not sell discontinued goods, he compared the last year of manufacture to the year 1997 to determine how many years the goods had been in use. Wherever his data was wanting, he assumed straight line depreciation. And from his data, collected in this most unusual way, he developed depreciation schedules for all of the those goods covered by the *Blue Books*.[36] Then, where different items within a Division produced different depreciation rates, Mr. Seltzer weighted them according to the percent of Sears' sales that each item represented to the whole, in order to arrive at a Division average. The values (rates) were finally reduced by 4.55% to account for what Mr. Seltzer described as the "Rash" factor,[37] and the tables created were presented to the team. The tables were then subsequently further reduced when Sears realized that it had not taken into account sales tax on the original purchases price.

Notwithstanding the efforts of Deloitte & Touche and Mr. Seltzer, two Divisions remained. Neither the "curves" identified by Deloitte & Touche, nor the *Blue Books* accounted for jewelry or luggage. Mr. Seltzer reported that the team filled this gap in the following novel manner. Mr. Kilpatric, counsel to Sears and a member of the team, called up clients in the jewelry business and made inquiry. That inquiry resulted in the

---

**35.** Mr. Seltzer, the next witness, later confirmed that the Iowa Curve was ultimately selected.

**36.** Technological obsolescence, condition, regional sales differences and different profit margins, although mentioned in the *Blue Books* as important factors, were not incorporated into Mr. Seltzer's tables. Nor did Mr. Seltzer run any statistical tests to validate his data among similar brands.

**37.** The Court assumes that Mr. Seltzer was referring to the recent Supreme Court case of *Associates Commercial Corp. v. Rash*, —— U.S. ——, 117 S.Ct. 1879, 138 L.Ed.2d 148 (1997).

jewelry depreciation schedules. And as for luggage, Mr. Flaherty of Deloitte & Touche called up someone at Northwest Airlines and inquired as to the values paid by that company for lost luggage. Following the testimony of Mr. Seltzer, the Court indicated that it would not require any further testimony.

On April 17, 1998, Sears offered the testimony of Stewart Gold, an attorney practicing in Detroit, Michigan. Mr. Gold opined as to the diligence required of counsel who execute § 524(c)(3) declarations, and specifically with respect to the declarations before the Court. As was the case above with respect to the testimony of debtor's counsel, this Court is hesitant to draw conclusions, since the United States Trustee has not had an opportunity to present evidence which bears on that same point. But it is sufficient for these purposes to say that Mr. Gold found none of the efforts of the debtors' counsel here to be wanting.

At the conclusion of Mr. Gold's testimony, the Court asked Sears' counsel if his client had any more evidence to offer. Sears declined. The court then scheduled May 29, 1998 as a continued date to hear the witnesses to be presented by the United States Trustee—a local attorney and local appraiser. Presumably, those witnesses would close the evidence. Finally, Sears asked for the opportunity to conduct discovery with respect to those witnesses before the continued date of taking evidence. The Court agreed.

On May 22, 1998, counsel for Sears and counsel for the United States Trustee filed a *joint motion* seeking a continuance of the final hearing date, because both parties wanted additional time to conduct discovery. The motion was granted, and the evidentiary hearing was continued generally, with a status conference scheduled for June 10, 1998. However, on June 1, 1998, Sears filed the instant Recusal Motion. At the June 10, 1998 hearing, the Court continued generally the further taking of evidence, and set deadlines for any response to be filed by the United States Trustee to the Recusal Motion, any reply by Sears, and any request by Sears for a hearing on its motion. The United State Trustee filed an opposition on June 29, 1998. Sears filed a reply on July 10, 1998,

and also filed a statement waiving its right to a hearing. The Recusal Motion was then taken under advisement.

## III. RECUSAL

### A. The Timeliness of the Recusal Request

■ "A motion to disqualify must be made 'at the earliest possible moment' after obtaining information of possible bias." *United States v. Yonkers Bd. of Educ.*, 946 F.2d 180, 183 (2d Cir.1991) (quoting *Apple v. Jewish Hosp. & Med. Ctr.*, 829 F.2d 326, 333 (2d Cir.1987)); *see also Jackson v. Fort Stanton Hosp. and Training Sch.*, 757 F.Supp. 1231, 1243 (D.N.M.1990); *In re Big Rivers Elec. Corp.*, 213 B.R. 962, 972 (Bankr.W.D.Ky. 1997). "The timeliness requirement is necessary to prevent waste of judicial resources, ... and to ensure that a movant does not 'hedg[e] its bets against the eventual outcome' of a proceeding." *Yonkers Bd. of Educ.*, 946 F.2d at 183 (quoting *Apple*, 829 F.2d at 334); *Bivens Gardens Office Bldg., Inc. v. Barnett Banks, Inc.*, 140 F.3d 898, 913 (11th Cir.1998) ("The recusal provision was intended to be a shield, not a sword.").

Here, Sears is contending that this Court's statements made as far back as October of 1997 evidenced its partiality, and yet Sears waited until completion of the non-evidentiary hearings, and then the testimony of seven of its employees, the eight debtors herein, their five attorneys, an employee of Deloitte & Touche, and its own witness before filing the Recusal Motion. Sears cannot contend that it was unaware of the issues raised by the Court until now, as the Court took pains, over and over, to discuss the relevant issues with counsel for Sears. The delay in the timing of the Recusal Motion permitted Sears to present its evidence, but threatens to preclude the United States Trustee from presenting his. Nevertheless, given the sensitive nature of a request to recuse, and the policy interest of maintaining the public's confidence in the judiciary, the Court will address the merits of the Recusal Motion.

### B. Section 455(a) Generally

■■ In arguing that this Court's recusal is required, Sears cites to subsection (a)

of 28 U.S.C. § 455. That statute provides: "Any justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." "[S]ection 455(a) requires recusal wherever the objective circumstances create an appearance of partiality." *In re Martinez–Catala*, 129 F.3d 213, 220 (1st Cir.1997). Even if a judge has an "inner conviction that he or she can decide the case fairly despite the circumstances," recusal is required where there is an appearance of partiality. *Id.*

▬▬▬ "The judge to whom a recusal motion is addressed is presumed to be impartial ... and there is a substantial burden on the moving party to show that the judge is not impartial...." *McCann v. Communications Design Corp.*, 775 F.Supp. 1506, 1522 (D.Conn.1991). While the judge must be mindful of the objective test under § 455(a), she or he must also consider the policy that "[A] judge once having drawn a case should not recuse himself on a unsupported, irrational, or highly tenuous speculation; were he or she to do so, the price of maintaining the purity of appearance would be the power of litigants or third parties to exercise a negative veto over the assignment of judges." *In re United States*, 666 F.2d 690, 694 (1st Cir.1981). The U.S. Court of Appeals for the First Circuit has also set forth the following ground rules:

> First, a charge of partiality must be supported by a factual basis.... Second, disqualification is appropriate only if the facts provide what an objective, knowledgeable member of the public would find to be a reasonable basis for doubting the judge's impartiality. Were less required, a judge could abdicate in difficult cases at the mere sound of controversy or a litigant could avoid adverse decisions by alleging the slightest of factual bases for bias.

*In re United States*, 666 F.2d at 695; *see also In re Allied–Signal, Inc.*, 891 F.2d 967, 969–70 (1st Cir.1989).

## C. Sears' Recusal Arguments

▬ Sears presents four arguments why this Court should recuse itself under § 455(a). Each will be addressed in turn.

### 1. The Court Has an "Agenda" Which Requires Disqualification

Sears argues as follows:

> Judge Boroff is improperly using Rule 9011 Orders to reach his goal of prohibiting Sears from obtaining reaffirmation agreements from debtors in circumstances the Judge personally finds reprehensible. At a minimum, he created the *appearance* that he is doing so. Judge Boroff announced his agenda against Sears from the very start. At the initial *Spencer* hearing where this all began, Judge Boroff only addressed Sears, questioning Sears on its practices at [section] 341 meetings.... The Judge never said he had problems with *debtor's attorneys*—the individuals who are supposedly the subjects of his Rule 9011 Orders.

Recusal Mot. at 29. In the section of its brief presenting this argument, Sears points to this Court's statements in conversations with its counsel at non-evidentiary hearings as proof of this Court's agenda against Sears. Sears refers to the following statements at the October 8, 1997 hearing: "Now we're going to turn to what we should have been talking about for a long time, which is what's happening in those reaffirmation agreements and what's happening at Section 341 meetings"; and "If Sears wants me to take this to the wall and issue the kinds of show-cause orders that are being issued in the Central District of California, I am fully prepared to enter analogous orders."

The foregoing statements from the October 8, 1997 hearing are not misquoted. This Court has painstakingly attempted in the first section of this opinion to explain their true context in time and place. And those statements, although borne of frustration with both the appearance of a lack of attention by debtors' counsel in the preparation of their § 524(c)(3) declarations and Sears' delay in effectuating its promised reforms, do not presage a particular result. The truth is that if this Court ultimately determines to strike some or all of the § 524(c)(3) attorney declarations and void the reaffirmation agreements, and also decides to set case law guidelines for the future review of such dec-

larations, the Court has not yet determined what those guidelines should be. On the one hand, consumer lien creditors, including Sears, appear to have valid security interests in the goods held by debtors in this Court. They are entitled to exercise the rights for which they have bargained. On the other hand, debtors are entitled to a complete disclosure of their rights and obligations, including an understanding of the true risks attendant to and the legal consequences of their actions. Further, any such guidelines must take into account the problems faced by debtors' counsel.[38]

Sears relies heavily on a case from the United States Court of Appeals for the Third Circuit, *United States v. Antar*, 53 F.3d 568 (3d Cir.1995). That case involved a criminal complaint against the defendant (among others) based on securities law and Racketeer Influenced and Corrupt Organizations ("RICO") law violations. There was also a previously-instituted civil action commenced by the Securities and Exchange Commission against the defendant, before the same U.S. District Court judge, in which the judge entered an order requiring the defendant to repatriate large sums of money that he had transferred to an Israeli bank. *Id.* at 571. The defendant failed to comply with the order and another order requiring him to disgorge illegally obtained money. *Id.* at 571–72. He was eventually convicted in the criminal proceeding by a jury. *Id.* at 572.

At the sentencing hearing, in discussions regarding the proper restitution to award to parties that suffered damages as a result of the defendant's and others' activities, the judge stated: "My object in this case from day one has always been to get back to the public that which was taken from it as a result of the fraudulent activities of this defendant and others." *Id.* at 573. The Third Circuit held:

[T]his is a case where the district judge, in stark, plain and unambiguous language, told the parties that his goal in the criminal case, from the beginning, was something other than what it should have been and, indeed, was improper. Of course, a trial judge in a criminal proceeding should ensure that a fair and orderly trial takes place in the courtroom. Here, however, the district court told the parties that his goal from the beginning of the criminal proceeding was to enforce a repatriation order and final judgment issued during a concurrent civil proceeding and give back the proceeds recovered to the public. It is difficult to imagine a starker example of when opinions formed during the course of judicial proceedings display a high degree of antagonism against a criminal defendant.... [I]t goes without saying that this is an improper role for a district judge during a criminal trial.

*Id.* at 576.

The goal of this Court is not to find Sears or any other creditor "at fault." The Court has held, *supra*, that it has a duty to verify that debtor's counsel has a rational basis for stating that reaffirming a particular obligation will not impose an undue hardship on the debtor or the debtor's dependents. This Court's goal is to ensure that debtors obtain the benefit which Congress intended for them—a fresh start; and that the fresh start not be thwarted by the failure of the debtor's counsel to meet his or her obligation under § 524(c)(3), whether or not such failure is justified or is in response to creditor pressure, whether appropriate or inappropriate. Undeniably, if a creditor's behavior impedes that fresh start, this Court's ultimate determination on the § 524(c)(3) issue may affect how that creditor does business—but not be-

---

**38.** In this respect, the Court respectfully disagrees with *Bruzzese*. It has been this Court's experience that, in most cases, § 524(c)(3) attorney declarations are not wanting because of attorney neglect or incompetence. Rather, they reflect a contradiction in role that is, in this Court's view, unique in the law. After giving appropriate advice to the debtor, the debtor's counsel is expected by § 524(c)(3) to take his or her client's instruction as to reaffirmation and then effectively decide whether to assent to or veto that decision. This Court cannot recall another scenario in which an attorney, an advocate, is so blatantly asked to "judge" his or her clients' actions. And so, while the application of Rule 9011 standards is necessary, the Court should not blind itself as to the difficult circumstances surrounding the decision-making of the debtor's counsel.

cause the Court is prejudiced against that creditor.

Sears analogizes this Court's actions to those of Judge Bufford from the Central District of California. Judge Bufford issued show cause orders relative to reaffirmations with Sears. Those orders were eventually struck down by the district court. However, this situation is very different. As explained by the United States Trustee:

> [One of Judge Bufford's orders] sought "... permanently [to] enjoin Sears from filing any reaffirmation agreements anywhere in the State of California, without full compliance with every aspect of a lengthy list of disclosures that the bankruptcy court believes should be made...." *Petition* at 18. By contrast, the Court has issued no such order—its focus remains upon the efforts of Debtors' counsel to confirm that the Agreements imposed no undue harm.

U.S. Trustee's Obj. to Recusal Mot. at 20. This Court has never contemplated issuing orders, directed at Sears, which would enjoin any of Sears business practices. This Court's attention is squarely directed at the practices of debtors' counsel.

Finally, Sears complains that "[t]he Judge never said he had problems with debtors' attorneys—the individuals who are supposedly the subjects of his Rule 9011 Orders," relying on the following statements made by this Court:

> I think I have a very good understanding as to the dynamics of these Section 341 meetings, and I have struck many of these declarations. I have never awarded sanctions, and ... when appropriate, I'm not at all bashful about awarding sanctions; but I've not awarded sanctions because I find that debtors' counsel are in a terrible box when a client is afraid that Sears may foreclose on collateral and may very well not be willing to accept counsel's advice that it is unlikely because of the important [sic] nature of that collateral. And those attorneys who have signed declarations of attorney which I have struck may very well not have made reasonable inquiry under Rule 9011, but I personally do not

believe it has anything to do with their competence.

Tr. of Jan. 14, 1998 Hrg. at 44–45; *see* Recusal Mot. at 29–30. Again, the statement is by no means misquoted. But neither is it preclusive. This Court is authorized to strike pleadings without ordering monetary sanctions. Fed. R. Bankr.P. 9011(c).

2. The Court's Institution of These Proceedings Without a Complaining Party-In-Interest Create an Appearance of Partiality Requiring Recusal

Sears next argues that "Judge Boroff's lack of impartiality is further evidenced by the very proceedings which Judge Boroff has commenced. There is no complaining party-in-interest—Judge Boroff raised all of the disputed issues himself." Recusal Mot. at 31–32. Sears points to cases holding that judges must not "become an advocate or otherwise use ... judicial powers to advantage or disadvantage a party unfairly," *Logue v. Dore,* 103 F.3d 1040, 1045 (1st Cir.1997); that a judge must remain detached and impartial, *Reserve Mining Co. v. Lord,* 529 F.2d 181, 186 (8th Cir.1976); and that "a right to be tried by a judge who is reasonably free from bias is a part of the fundamental right to a fair trial." *Nicodemus v. Chrysler Corp.,* 596 F.2d 152, 155–56 (6th Cir.1979) (quoting *Whitaker v. McLean,* 118 F.2d 596, 596 (D.C.Cir.1941)).

However, this argument fails to recognize that Rule 9011(c)(1)(B) *expressly authorizes* bankruptcy judges to raise possible violations of the rule's provisions, even where there is only the appearance of a violation. Rule 9011 entrusts bankruptcy courts with the authority to issue show cause orders in such circumstances. *See* Rule 9011(c)(1)(B). Thus, it is unfathomable how a reasonable observer could question this Court's impartiality simply on the basis that it commenced an inquiry explicitly contemplated by the Federal Rules of Bankruptcy Procedure.

As to this Court's questioning of witnesses and related matters, it follows logically from the nature of a show cause hearing in this context that a court may need to take evidence. The current value of the consumer goods securing the reaffirmed debt, whether

or not counsel had a valid basis for believing that Sears would replevy its collateral (if counsel did so believe), and what inquiries counsel made of his or her client and the creditor are all relevant questions of fact, which are most properly resolved by the taking of evidence.

3. The Court Has Scrutinized Reaffirmations with Sears Much More Closely than Those with Other Creditors, Evidencing Partiality

Sears argues that this Court has "treated identically-situated creditors far more favorably than Sears." Recusal Mot. at 34. Sears refers specifically to reaffirmations with other creditors filed by two of the debtors whose reaffirmations are currently before the Court. In the *Callahan* case, the debtor, a truck driver, entered into a reaffirmation of an unsecured debt with both Sears and St. Jean's Credit Union (the "Credit Union"), and stated in an affidavit that he required both his Sears card and his Credit Union card "for traveling expenses and purchases" required by his employer. At the first hearing on both agreements, the Credit Union representative was not present, and the Court continued the hearing on that agreement to another date. With respect to the Sears reaffirmation agreement, the Court noted that the debtor was reaffirming over $2,400 based on a collateral value of $330 and a $500 further line of credit, and continued its review to a date coincident with the other agreements now before the Court. At the later continued hearing on the Credit Union reaffirmation agreement, the Court was for the first time advised that a closer review of Schedules I and J would reveal that the debtor had postpetition net disposable income. Therefore, the Court found that no further action was required.

In the *Wayland* case, Mr. Wayland agreed to reaffirm a debt with Norwest Financial MA, Inc. ("Norwest") collateralized in furniture. According to the testimony of the debtor's counsel at a hearing relative to this reaffirmation, the furniture had been purchased in April 1996 for approximately $3,600, and Mr. Wayland owed Norwest $3,000, according to his schedules. He agreed to reaffirm $1,800, payable at $100 per month with no interest. In response to the question of how the $1,800 reaffirmed amount compared to the current value of the collateral, counsel to the debtor stated, "my guess is its—again, furniture is always a difficult item to value—is that it's probably equal to the value of the furniture or thereabouts." The Court then found that no further action was required.

Employing these two examples, Sears argues that the Court appears to like other creditors more than it likes Sears. But, after review of the transcripts of the hearings, this Court believes that there were significant differences presented by those other reaffirmations. In *Callahan*, the Court took no action relative to the § 524(c)(3) attorney declaration in the Credit Union reaffirmation agreement because the Court was advised (as it had not been at the first hearing on the Sears reaffirmation agreement) that Mr. Callahan had a monthly surplus. And, in *Wayland*, the reaffirmed debt was substantially reduced from the amount originally owed to the creditor, the reaffirmed debt was to be paid without interest, and the collateral, the debtors' furniture, consisted of goods of indisputably high value and likely to be replevied if reaffirmation was not possible.

Nevertheless, even if this court was wrong in permitting those two § 524(c)(3) attorney declarations to pass, that does not elevate the § 524(c)(3) declarations here under review. Further, a review of statistics generated by the Clerk's Office establishes that Sears has not been singled out. This Court has struck many § 524(c)(3) attorney declarations in reaffirmation agreements with other creditors. Further, as provided in footnote 14, *supra*, the Court only held hearings with respect to 38% of the reaffirmations filed by Sears and only approximately 20% were altered or voided. Finally, the fact that Sears has been subject to more scrutiny than other creditors is in large part due to its admitted status as the largest solicitor of reaffirmations in this district.[39]

---

**39.** This Court's statistics show that 3,653 reaffirmations were filed in the District of Massachu-

setts from April 1, 1997 to June 15, 1998, and that Sears was the subject creditor with respect

#### 4. The Court's Partiality Against Sears Comes from an Extra–Judicial Source

■ Lastly, Sears argues that this Court must recuse because the considerations employed by the Court arise from an "extrajudicial source." The "extrajudicial source" doctrine requires that a judge be disqualified to hear a matter where a judge's bias emanates from something other than judicial proceedings. It has been historically applied in judge disqualification proceedings under a different statute, 28 U.S.C. § 144. In *Liteky v. United States*, 510 U.S. 540, 114 S.Ct. 1147, 127 L.Ed.2d 474 (1994), the Supreme Court held that the doctrine should also be applied in connection with § 455(a). However, the Court also limited the breadth of the doctrine as follows:

> [W]e think that the "extrajudicial source" doctrine, as we have described it, applies to § 455(a). As we have described it, however, there is not much doctrine to the doctrine. The fact that an opinion held by a judge derives from a source outside judicial proceedings is not a necessary condition for "bias or prejudice" recusal, since predispositions developed during the course of a trial will sometimes (albeit rarely) suffice. Nor is it a sufficient condition for "bias or prejudice" recusal, since some opinions acquired outside the context of judicial proceedings (for example, the judge's view of the law acquired in scholarly reading) will not suffice. Since neither the presence of an extrajudicial source necessarily establishes bias, nor the absence of an extrajudicial source necessarily precludes bias, it would be better to speak of the existence of a significant (and often determinative) "extrajudicial source" factor, than of an "extrajudicial source" doctrine, in recusal jurisprudence.
>
> .......
>
> It is enough for present purposes to say the following: First, judicial rulings alone almost never constitute a valid basis for a bias or partiality motion.... in and of themselves (i.e., apart from surrounding comments or accompanying opinion), they cannot possibly show reliance upon an extrajudicial source; and can only in the rarest circumstances evidence the degree of favoritism or antagonism required ... when no extrajudicial source is involved. Almost invariably, they are proper grounds for appeal, not for recusal. Second, opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible. Thus, judicial remarks during the course of a trial that are critical or disapproving of, or even hostile to, counsel, the parties, or their cases, ordinarily do not support a bias or partiality challenge. They may do so if they reveal an opinion that derives from an extrajudicial source; and they will do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible.

510 U.S. at 554, 114 S.Ct. at 1157.

■ Sears suggests that this Court's opinions about Sears' reaffirmation practices must come from an extrajudicial source. However, as detailed above, this Court's opinions are well-supported from the reaffirmation agreements filed with this Court, the statements of Sears' counsel and debtors' counsel, the provisions of the Bankruptcy Code (and its legislative history) and the Bankruptcy Rules. Conclusions drawn from the interpretation of statutes and rules do not qualify as information procured from an extrajudicial source.

Sears makes specific reference to this Court's statement at the October 8, 1997 hearing that "we should have been talking about ... what's happening at Section 341 meetings" for a long time. Sears argues that the statement reveals an extrajudicial source because the Court made the statement at the first of many hearings in these eight cases,

---

to 1,010 of them, or approximately 28% of them. This number would be higher if Sears had not discontinued filing reaffirmations in cases before this Court, which occurred in December 1997.

Further, once reaffirmation based on home mortgages and automobiles are eliminated, Sears reaffirmations total well over 50% of the balance.

and referred to conduct at section 341 meetings, information which the Court could only have obtained extrajudicially (since the Code prohibits bankruptcy courts from presiding over or attending those meetings. *See* § 341(c)). This argument is without merit. Sears itself has informed the Court in prior hearings on reaffirmation agreements between Sears and other debtors that much of its solicitation of reaffirmations is done concurrently with the § 341 meetings. To suggest that the Court was implying that it had information about the *actual* events at the § 341 meetings in these cases is to change the statement's meaning.

## IV. CONCLUSION

As is set forth above, Congress has, through the Bankruptcy Code, evidenced its desire to have the "honest, but unfortunate" debtor obtain a fresh start through the discharge of certain indebtedness. Reaffirmation of any part of that indebtedness is permitted, but only under carefully controlled conditions. One of those conditions is that reaffirmation agreements meet the tests set forth in § 524(c). And this Court has an obligation to use its best efforts to ensure that the § 524(c) conditions are met by insisting that § 524(c)(3) attorney declarations reflect a reasonable inquiry based on appropriate factual support. This Court bears no "deep-seated" antagonism towards Sears. This Court's antagonism is reserved for reaffirmation agreements which fail to conform to the requirements set forth in § 524(c)(3).

This Court will hear the United States Trustee's evidence (and any further evidence which Sears or the debtors may care to offer). Then, after evaluating all of the evidence, the Court will decide the Rule 9011 questions presented by the § 524(c)(3) attorney declarations in these eight cases.

For all of the various reasons set forth above, Sears' Motion for Recusal is DENIED. Separate orders shall issue consistent with this Memorandum of Decision.